## MAYOR AND CITY COUNCIL OF BALTIMORE, A MUNICIPAL CORPORATION,

*vs.*

## THE M. A. TALBOTT COMPANY OF BALTIMORE CITY, A CORPORATION.

*Construction of municipal works: authority of City Engineer to settle disputes.*

Where a contract for the building of sewers for Baltimore City provided that "to prevent disputes and litigation, the engineer * * * shall decide all questions in relation to the work * * * shall in all cases decide every question which may arise relative to the performance of the contract on the part of the contractor * * * ," it was *held*, that the question of the city's liability was a question arising under the contract, and this question, as well of what loss, if any, had been sustained by the interference of the city inspectors with the dynamite work, was to be determined by the Engineer, and his decisions thereon were final.                                    p. 246

*Decided July 9th, 1918.*

Appeal from the Superior Court of Baltimore City. (DOBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*S. S. Field, City Solicitor,* (with whom was *Robert F. Leach, Jr., Assistant City Solicitor,* on the brief), for the appellant.

*J. Kemp Bartlett* (with whom was *J. Kemp Bartlett, Jr.,* on the brief), for the appellee.

Pattison, J., delivered the opinion of the Court.

The suit in this case arises out of a written contract made on the 22nd day of September, 1909, by The M. A. Talbott Co., Incorporated, with the City of Baltimore, executed on behalf of the city by the members of the Sewerage Commission and J. Barry Mahool, its Mayor, for the building and construction of a section of the Sanitary Sewer in said city, known as Section No. 1 of Jones Falls, Interceptor.

The amended declaration, filed June 20th, 1912, sets out the contract signed by the parties thereto, not including the specifications which were by the contract made a part of it, but as stated in the brief of the appellee, the parties to this suit have agreed that such specifications shall be considered and treated as embraced within the declaration.

The declaration then charges the defendant with a breach of the contract in that

"It did wrongfully require the plaintiff to do the rock excavation provided for in said contract and specifications in a manner materially different from that called for by said contract and specifications, by changing the person or persons designated in said contract to act as inspectors of blasting, over the protest of the plaintiff, and by compelling the plaintiff to use such small charges and radically different methods in the blasting operation, contrary to said contract and specifications, as to seriously and wrongfully hinder and delay the plaintiff from carrying on the rock excavation required under said contract to be performed."

A demurrer filed to the declaration being overruled, a bill of particulars was asked for and filed, in which the amount of six hundred and forty-two dollars and thirty-six cents ($642.36) was claimed for "unpaid balance of contract price certified by the engineer, designated in said contract as due by the defendant to the plaintiff," in addition to items of loss alleged to have been sustained by the plaintiff.

Exceptions were filed to the bill of particulars but these were overruled. The defendant then pleaded: (first), that it

never promised as alleged; (second), that it was never indebted as alleged; and (third), that the contract, which is set forth in the declaration, provides as follows:

"44.   In all operations connected with the work, all ordinances of the City of Baltimore and all laws of the United States and the State of Maryland, which shall be or become applicable to, and control or limit in any way the actions of, those engaged in any way as principal or agent, must be respected and strictly complied with.

"The contractor shall keep himself fully informed of existing and future State and national laws and city ordinances and regulations in any manner affecting those engaged and employed in or on the work, or in any way affecting the conduct of the work; and of all orders or decrees of bodies or officials having any jurisdiction or authority over the same. He shall himself at all times observe and comply with, and cause any and all persons, firms and corporations employed by him or under him, to observe and comply with, all such laws, ordinances and regulations, orders and decrees." * * *

"Ordinance No. 229, approved March 21st, 1905, which was in full force and effect prior to the award of the same contract, provides:

" '76A.   No person shall blast rock or stone or other material or thing with gunpower, giant powder, dynamite, gun cotton, nitro-glycerine, or any other explosive compound within the limits of the City of Baltimore, without the written consent of the Board of Public Safety, for the time being.'

"The rules and regulations of the Board of Public Safety, regulating blasting to be done within the city limits, provide that all blasting must be done under the supervision of inspectors of the Board of Public Safety, and that such inspectors shall regulate and control the amount of explosives to be used in said blasting, and that all persons, firms and corporations engaged in such blasting work must comply with the orders of said inspectors.

"In view, therefore, of the said provisions of the contract, ordinance, rules and regulations of the City of Baltimore, the plaintiff agreed with the defendant that all blasting operations of the plaintiff should be subject to the control and authority of the Board of Public Safety and its inspectors.

"And the defendant further says that the said Board of Public Safety and its inspectors duly and properly exercised the authority committed to them under the law, for the safety and protection of the public."

A demurrer filed to the third plea was sustained, and the case went to trial upon the first and second pleas. The trial resulted in a judgment for the plaintiff for the sum of twenty-six thousand dollars ($26,000.00). From that judgment this appeal was taken.

The specifications provide that "the work to be done shall be under the general supervision of the engineer"; and the use of the term engineer, "whenever not qualified, shall mean the Engineer of the Commission." He "may exercise such general control over the conduct of the work, at any time or place, as shall be required, in his opinion, to safeguard the interests of the city"; and "all methods of tunnelling shall be satisfactory to the engineer and subject to his approval, and shall be changed from time to time, at the cost of the contractor, if in the judgment of the engineer, the conditions so require." "Drilling and blasting shall be conducted with all possible care," and "explosives shall be used of such character and strength as may be permitted by the engineer," and "all necessary precautions must be taken to prevent accident and injury or damage to adjacent buildings; * * * and blasts shall be made only during such hours as shall be designated by the engineer."

Under these provisions, the engineer of the Commission assumed supervision of the work, and on October 22nd, 1909, O. W. Connet, the division engineer, acting under his chief, Calvin W. Hendrick, wrote to the plaintiff calling its attention to the specifications which requires the method of tun-

nelling to be satisfactory to the engineer and subject to his approval, and asked that it submit to the chief engineer "a drawing showing the methods you propose to use, for his approval, so that there will be no delay when you reach the tunnel."

On October 29th, Connet again wrote the plaintiff and called its attention to the specifications for rock excavation, especially "with reference to blasting and the precautions to be taken to prevent accident and damages."

So far as the record discloses, these letters were never answered, but Wm. B. Thomas, assistant engineer, in charge of the work of The M. A. Talbott Co., testified that he, about the time these letters were written, discussed with E. H. Burwell, an assistant engineer of the Sewerage Commission, upon the work, the subject of the manner of blasting the rock and was told by him that he was getting up a "sketch," by which he should drill the holes and blast the rock, and that he would give him a copy of it, which he did; that he did not know what had become of the "sketch," although he believed a search had been made for it. Upon being asked, he went to the board and "approximately reproduced" that "sketch." He was then asked: "Q. How long were those holes to be? A. About eight feet at such an angle as would bring them together if extended to a length of twelve feet. Q. Did the papers show anything else with reference to the holes? If so, draw it." The witness did as he was requested and was then asked: "Q. Of course, in the plan you have drawn, you see three of the holes; you do not see the underneath three? A. No, sir." This was all that was said by Thomas of the "sketch" in his examination in chief. He was then asked: "Q. Did you carry out those instructions, and if you did not, explain why? A. We tried to carry out the instructions but we were stopped by Mr. McGovern. He said that if you drill those holes so deep, you can not load them up sufficiently. He said you can drill them, but you can not load them up with enough dynamite to pull it."

The witness then stated that McGovern was of the "City's Engineering Department," a representative of the city.

The presence of McGovern upon the work, supervising and controlling the blasting operation as above mentioned, is accounted for by the fact that the plaintiff company, before undertaking to blast the rock in the tunnel, had applied to and had obtained from the Board of Public Safety, its written consent to do such blasting. This application made by the written consent given to the plaintiff was pursuant, it seems, to the Ordinance of the Mayor and City Council, known as Ordinance No. 229, set out in defendant's third plea.

At the time said written consent was given, McGovern, pursuant to the regulations of said Board, was placed upon the work as an inspector to regulate and control the amount of explosives to be used in the blasting.

The witness, Thomas, further testified that McGovern made him "cut the holes down to four feet instead of eight feet." "Q. What did McGovern do in reference to the size of the charges? A. He cut them down considerably from what we wanted to do it. Q. What would have been the proper charge to have placed in holes eight feet deep? A. A stick to the foot. Q. That is, eight sticks to each hole? A. Yes, sir. Q. You mean to shoot them all off at once? A. Yes. Q. Six holes at once? A. Yes, sir." He said McGovern, permitted them to use at the most only a stick and a half of dynamite to a hole, and to shoot one hole only at a time, each stick weighing little over a half pound. He, however, was contradicted by McGovern, who said he allowed them to blow four core holes at one time and gave them about two sticks and half to a hole.

These alleged restrictions, as Thomas testified, were followed until about the last of January, when, as he stated, Mr. Talbott told him "to shoot the holes as they ought to be shot, as he was losing thousands of dollars the way we were going now; he (McGovern) said, there is no use of drilling them, because you can not load them, and I said, we will see about

that. We had the holes drilled and I and my head foreman each took a bucket of dynamite, full of dynamite, a tin pail and we had possibly in each pail 20 sticks of dynamite; and in going down, the foreman he went down the shaft ahead of me; and when I came up McGovern said, you are not going to take that down, and I said, yes, I am, and he said, you are not, you are not going to shoot them off, and he tried to grab the bucket out of my hand; I said, don't do that, what are you going to do, blow us all up? He said, never mind what I am going to do, you are not going to shoot the dynamite off and I said, positively I am going to shoot it off, and I took down the dynamite and loaded the holes, we had 6 holes, and we loaded the holes, at that time they were about six feet deep, we loaded the holes one stick to the foot. * * * And then I said, all right, let her go, and it was exploded and the noise was not near as great as some of the single shots McGovern forced me to make and the vibration was very little; McGovern came up and said I am going to get you arrested; I said, that's your privilege; he said, if you do it again—no I am going to get you arrested now; I said, all right, and he went around somewhere and finally he came back but I was never arrested."

Upon cross-examination, Thomas was asked: "Q. Did you get it (the 'sketch') from him (Burwell), or did you make it up together? A. If I remember correctly, Mr. Burwell made it. Mr. Burwell and I talked it over, whether before or after he had the drawing made, I do not know. Q. Did it call for the depth of the hole, and if so what was the depth? A. I could not say; I do not remember the depth being given. Q. Do you say it was given or not? A. I am not positive whether the depth was given or not. A. Why did you undertake to tell the Court and jury the other day about the depth, in describing this plan? A. It was put on there for the simple reason to give it a practical way, the way I wanted to do it, the eight feet. Q. What else did the paper have on it? A. The lower 'sketch' had another ring, if I remember correctly, it had a line showing the breakage." He further testified

that "Burwell being a theoretical man, he had a theory that he was working on and he wanted to see whether, practically, if it would do," but "he did not have a chance to experiment with his theory"; and when asked where Burwell got it from he replied: "I suppose he read it in the books; I told him, I said, that is the practice I have always used in getting the core out." He also testified that he never brought the matter of the "sketch" or plan to the attention of either Mr. Connet or Mr. Hendrick, nor does it appear that he ever complained to Hendrick, Connet or Burwell of any interference on the part of the inspectors of the city in blasting the rock in accordance with the alleged plan or "sketch" given to him by Burwell.

It will be observed that Thomas, in his examination-in-chief, testified that the holes by the alleged "sketch" given to him by Burwell were to be eight feet long; but upon cross-examination he testified that he was not positive that any depth of the holes were given, and in describing the plan or "sketch," said: "It was put on there for the simple reason to give it a practical way, *the way I wanted to do it."* It may also be said there is nothing found in his testimony, or elsewhere in the record showing that the alleged "sketch" made any reference whatever to the size of the charges of dynamite to be used in the blasting. As to the amount or size of such charges, the alleged "sketch" or plan was absolutely silent.

When Thomas was asked as to McGovern's action in reference to the size of the charges, he answered: "He cut them down considerably from what *we wanted to do it"*; then goes on to say what would have been a proper charge in a hole 8 feet deep.

It will thus be seen that neither the depth of the hole nor the size of the charges were given in the "sketch" alleged to have been furnished by Burwell to Thomas to be used, as the plaintiff claimed, in blasting the rock.

Burwell, when placed upon the stand by the defendant, testified that the "sketch" referred to "was simply a sugges-

tion that the engineer in charge of the work made to the superintendent or contractor, showing in a friendly way an interest in the progress of the work"; that he conferred with neither Mr. Connet nor Mr. Hendrick in relation to the "sketch" before making it, nor was it thereafter passed upon by either of them; that neither it nor a copy of it was ever given to Mr. Thomas, but that it was kept in a loose-leaf book in his possession. It was simply a "suggestion made upon his own initiative," and, as he said, "I could not possibly have insisted that that method be carried out, because I had nothing in the world to do with the amount of dynamite," indicating that he thought the amount of dynamite to be used was under the control and supervision of the inspectors.

The alleged "sketch" which was described by Thomas was put in evidence, but it does not appear in the record, nor is it before us for our inspection. It was never mentioned nor referred to in any of the communications between the plaintiff and Hendrick, in which the plaintiff complained of the requirements made by the City Engineer, nor in its letters asking for extension of time. The evidence not only shows that such "sketch" or plan was not sufficiently comprehensive in directing the manner or method by which the blasting was to be done, but it fails to disclose that it was ever brought to the attention of the Engineer of the Sewerage Commission and approved by him.

The fact remained, although the plaintiff was twice asked to do so, that no plan or method by which the blasting was to be done was ever submitted by it for the approval of the Engineer of the Sewerage Commission, and that no plan or method, other than the one used in the blasting of the rock within the tunnel, was ever approved by the Engineer.

On January 31st, 1910, about the time of the trouble between Thomas and McGovern, in which the former disregarded the wishes of the latter in blasting the rock, B. T. Fendall, City Engineer, wrote to The M. A. Talbott Co., saying:

"I understand you are not satisfied with the rulings of my inspector on the work you are doing on Clifton Place (Jones' Falls Interceptor), but that you propose to load and fire your holes as you think best, regardless of instructions of inspector. This is to notify you if you do anything of the sort, I shall ask the Board of Public Safety to cancel your permit, and will absolutely stop the work until the Mayor shall relieve me of the responsibility and let you proceed under the direction of the Sewerage Commission, or some other agency other than under the supervision of this department.

"I do not wish to be arbitrary in the matter, but your attitude forces me to be arbitrary. If any further trouble is reported to me, I shall certainly act along the lines herein indicated."

On February 7th, 1910, The M. A. Talbott Co. wrote to Mr. Hendrick, enclosing to him Mr. Fendall's letter of January 31st, calling Mr. Hendrick's attention to the provisions of Ordinance No. 229, and to certain provisions of the contract, in relation to the supervision of the work and the blasting of the rock in the tunnel, saying:

"It will be seen at once that the provisions of Section 72 of the City Code (Ordinance 229) and those of Section 103 of said specifications are at variance. This apparent conflict at once raises the question as to which enactment of the Mayor and City Council of Baltimore: its ordinance adopted in 1906, or its contract made in 1909, had precedence. It seems clear to us that the latest expression qualifies the former, to the extent that the supervision of the use of explosives in the construction of the work contemplated in building Jones' Falls Interceptor, is placed in the charge of the Chief Engineer of the Sewerage Commission. Section 44 of said specifications declares that 'all ordinances of the City of Baltimore * * * which shall be * * * applicable * * * must be respected and strictly complied with.'

"This can only mean such ordinances as are applicable and not at variance with the clearly defined requirements of the specifications. Any other construction would completely nullify the provisions of Section 103, which certainly was not intended.

"Now, while we have always protested the presence and authority of an inspector from the Department of Public Improvements on the line of our work in any capacity except as an onlooker, we have been respectful to him when he has asserted an authority to regulate the manner of drilling, loading and shooting of our powder holes, realizing that he was acting under orders. And we have permitted our employees to be influenced and directed by him even when it was clearly apparent that he was inexperienced and incompetent.

"We permitted this deplorable condition of affairs to exist for over three months in the hope that matters would right themselves before our losses incident thereto became intolerable.

"Finally, after a loss of nearly $10,000.00 incident to permitting him, over our protests, to regulate the use of explosives, we declined to permit our employees to be influenced or directed by him any longer."

In the letter it was also said: "We feel satisfied that the City Solicitor will agree with this proposition, but whether he does or not, we are advised that it is the law."

In reply to the plaintiff's letter of February 7th, Mr. Hendrick on the following day wrote, saying:

"I beg to acknowledge receipt of your letter of the 7th, regarding the matter of blasting on the Jones' Falls Interceptor, which I will give careful consideration."

Between the date of this letter and the 1st of March, the City Solicitor gave an opinion as to the application of said ordinance to the work under the contract, holding that the city ordinance and the regulations of the Board of Public Safety passed thereunder did not apply, and that the inspector

was without authority or jurisdiction in the matter; and on March 1st, 1910, Mr. Fendall wrote Mr. Hendrick, saying:

"The City Solicitor having ruled that this department has no jurisdiction over blasting which may go on in the city, I beg to advise that I have issued a general order to the general inspector to withdraw all of his inspectors on blasting work from the work, and in the future I shall have nothing whatever to do with blasting, blasting permits or inspections of the blasting, whether done by city departments or private individuals, unless some city department may especially desire the services of one of my inspectors."

On March 2nd, 1910, Mr. Hendrick wrote to The M. A. Talbott Co., saying:

"I enclose herewith copy of a letter received from the City Engineer, dated March 1st, regarding the matter of supervision over blasting. I wish to say that anyone in your employ who does not promptly and carefully obey any instructions received from our engineers or inspectors on the work will be removed from the work at once, as provided in the specifications. It is necessary that every precaution should be taken to safeguard the citizens, both as to their safety and annoyance."

This is the first direction of Mr. Hendrick, Engineer of the Sewerage Commission, to the plaintiff found in the record as to its duty in relation to the blasting of the rock within the tunnel and the way it should be done. It was told of the necessity of using every precaution to safeguard the citizens, both as to their safety and annoyance, and it was also told to obey any instructions received from the engineers or inspectors on the work, and that its failure to do so would result in the removal of employees disobeying such instructions.

In consequence, however, of the ruling of the City Solicitor, Mr. Fendall, the City Engineer, withdrew his inspectors from the work; but on or about March 17th, the Mayor of

238    M. & C. C. OF BALTO. vs. TALBOTT CO.

Opinion of the Court..                    [133

the city, upon complaint made to him by the property holders
and residents of the city, in the vicinity where the blasting
was being done of the injury to their property and annoyance
to them, caused by the blasting of the rocks in the tunnel, and
after visiting the scene of such operations and investigating
such complaints he instructed the chief of police to arrest the
employees of the plaintiff "if they blasted on this work with-
out the permission of the City Engineer." This action was
taken by him under and by virtue of the ordinance aforesaid,
which he regarded as available and operative to prevent an-
noyance to such persons, and to protect their property.

Thereafter Mr. Bartlett, counsel for the plaintiff, called
upon Mr. Mahool, Mayor of the City, in relation to the con-
troversy, and as testified to by Mr. Mahool, who was placed
upon the stand by the plaintiff, the arrangement then made
by them was "that the work was to go on by Mr. Talbott and
we were going to carry out what we felt was our duty to pro-
tect the public against the blasting, which we considered to
be not done in accordance with what we thought was to the
interest of the public safety," and if by so doing any liability
was created on the part of the city, it was able to pay the
amount for which it should be held liable. The question of
its liability and the amount of such liability, if any, was not
involved in this arrangement.

Pursuant to such arrangement or agreement, the order pre-
viously given to the Marshal or Chief of Police was counter-
manded by the Mayor, and the Inspectors of the City's Engi-
neering Department, were again placed upon the work.

The specifications provide that:

"The Engineer shall, from time to time, as the work
progresses, on or about the last day of each month,
make in writing an estimate, such as he shall believe
to be just and fair, of the amount and value of the
work done and the materials incorporated into the
work by the contractor, under the specifications."

The monthly estimates, made subsequent to the first,
"except the final estimate, shall be of the amount and

value of the work done and of the materials incorporated into the work since the last preceding estimate was made," and "such estimates shall not be required to be made by strict measurements, but they may be approximately only"; and "when, in the opinion of the Engineer the contractor shall have completely performed the contract on his part, the Engineer shall make a final estimate, based on actual measurements, of the whole amount of work done by the contractor, and of the value of such work under and according to the terms of the contract, and shall certify to the Commission, in writing, the amount of the final estimate and the completion of the work. Forty (40) days after the completion of the work, as determined by the Enginer, upon the filing by the Commission, in the office of the Comptroller, of a certificate of the completion and the acceptance of the work, made by the Chief Engineer and the Commission, the city shall pay to the contractor the amount remaining after deducting from the total amount or value of the work, as stated in the final estimate, all such sums as have heretofore been paid to the contractor under any of the provisions of the contract, except such sums as may have been paid for extra work, and also any sum or all sums of money which by the terms thereof the city is or may be authorized to reserve or retain; * * * All monthly estimates upon which partial payments have been made, being merely estimates, shall be subject to correction in the final certificate, which final certificate may be made without notice thereof to the contractor, or of the measurements upon which it is based."

Pursuant to the above requirements of the specifications, said monthly estimates were made by Hendrick on the first day of each month during the progress of the work, with a certificate attached to each, that the work done and materials furnished during the preceding calendar month had been done and furnished *in accordance with the terms of the contract* to the value of the amount therein named. Upon each

of the estimates is found the receipt of the M. A. Talbott
Co., signed either by M. A. Talbott, President, or Adam
Stein.

This is true of the monthly estimates following the afore-
said conference between the Mayor and the counsel for the
plaintiff.

On October 15, 1910, Mr. Hendrick submitted to the Com-
mission a final estimate for materials furnished and labor
done by the contractor, under said contract, in which he cer-
tified that the work done and materials furnished had been
done and furnished *in accordance with the terms of the con-
tract* to the value of $39,119.02, and that the amount payable
to The M. A. Talbott Co. under the terms of the contract was
$5,867.85.    Upon this estimate, we find the following re-
ceipt,

> "Subject to our letter of November 7th, 1910,
> > "Received payment,
> > > "The M. A. Talbott Co.,
> > > > "Per Adam Stein."

The record further discloses that the plaintiff gave to the
defendant a receipt, dated the 17th day of December, 1910,
for $4,865.99, "being the final estimate on Sanitary Contract
No. 42, known as Jones Falls Interceptor, Section 1," less
the amount retained therefrom, pending the determination of
the plaintiff's liability on claims aggregating $1,001.86, with
the reservation that the receipt was signed subject to the
terms of its said letter to Hendrick, dated November 7th,
1910.

The letter referred to in the receipt upon the estimate and
in the separate receipt of December 17th, is as follows:

> "We hand you herewith your estimate called 'Final
> Estimate on Sanitary Contract No. 42, Jones' Falls
> Interceptor, Section No. 1,' showing the balance due
> us to be the sum of $5,867.85.    We have receipted this
> estimate in the usual manner, but we desire to call your
> attention to the fact that, in doing so, we do not waive
> our claim against the city for increased cost, due to the

acts of the city in changing, without our consent, the manner of blasting, and requiring the blasting to be done in a manner at variance with the terms of the contract. In other words, in receipting this estimate, we reserve the right to contend at the proper time, that the city has abrogated this contract by requiring us to do the blasting in a manner different from that provided for by the terms of the contract, thereby greatly increasing the cost of doing the work and entitling us to compensation for the work done, not upon the basis of compensation prescribed by the contract, but upon force account, including actual cost, plus the usual percentage."

The specifications further provide that:

"To prevent disputes and litigations, the Engineer shall in all cases determine the amount, quality and acceptability of the work which is to be paid for under the contract; shall decide all questions in relation to said work and the performance thereof, and shall in all cases decide every question which may arise relative to the fulfillment of the contract on the part of the contractor. His determination, decision and estimate shall be final and conclusive, and in case any questions shall arise between the parties touching the contract, such determination, decision and estimate shall be a condition precedent to the right of the contractor to receive any moneys under the contract."

A vast amount of testimony was taken, amounting to more than 550 printed pages, much of which was upon the question of the alleged cost incurred by the plaintiff in blasting the rock over and above what it would have cost had the plaintiff been permitted to blast it in accordance with the alleged plan or method said to have been furnished by Burwell to Thomas and approved by the Engineer of the Commission; but as we view this case, there is no need of a discussion of the effect and weight of such testimony.

The plaintiff at the conclusion of the testimony offered three prayers, all of which were granted. The defendant

offered sixteen, of which, one, the eighth prayer was granted which instructed the jury that, "in no event is the plaintiff entitled to recover for any loss for or on account of any restrictions or interference claimed by it to have been imposed upon it by the defendant, prior to March 18th, 1910."

By the city's sixteenth prayer, which was rejected, the Court was asked to instruct the jury: "That, under the contract offered in evidence, the Chief Engineer of the Sewerage Commission was authorized to determine all questions in relation to said work and the performance thereof, and to decide every question which might arise between the parties touching the contract, and his estimate and decision was, by agreement of the parties, made final and a condition precedent to the plaintiff's right to recover, and that upon the undisputed evidence in this case, the Chief Engineer of the Sewerage Commission did, on October 15th, 1910, render his decision upon every question in dispute between the parties, and did send a statement to the City Comptroller showing his decision, and that of the amount shown to be due according to said decision, it is conceded that all of the amount shown by the same to have been due the contractor has been paid, except the sum of six hundred and forty-two and 36/100 dollars ($642.36) which is now due to the contractor with or without interest thereon, in the discretion of the jury, from the time when the same was due and payable; and there is no evidence in this case legally sufficient to show that the Chief Engineer of the Sewerage Commission was guilty of any fraud or bad faith in the rendering of said decision, and, therefore, the same is binding in this case, and the verdict of the jury should be in accordance therewith."

To this prayer the plaintiff specially excepted upon the ground that: "It ignores the written agreement between the parties offered in evidence to the effect that the question of the plaintiff's right to recover in the action should be and remain an open question to be determined in some other manner than by the action of the said Chief Engineer."

This exception was sustained, and as we have said, the prayer was rejected. The Court in our opinion erred in its action upon said exception, and in its refusal to grant said prayer.

The dispute in this case arose out of what is said by the plaintiff to be a variance between the ordinance mentioned and the regulations of the Board of Public Safety passed in pursuance thereof, and the provisions of the contract mentioned in the letter of February 7th from the plaintiff to Mr. Hendrick.

The position taken by the plaintiff in relation thereto was, that because of said alleged conflict, either the ordinance and the regulations passed thereunder or the said provisions of the contract should be disregarded, and as the contract was passed subsequent to the ordinance and regulations and was the "last word of the city on the subject," the provisions of the contract should prevail.

It will be observed, however, that the plaintiff before undertaking the blasting operations in the tunnel applied to and obtained from the city a permit, provided for by the ordinance, to blast the rock within the tunnel, thereby, at that time, recognizing and treating the ordinance as applying to the work to be done under the contract.

In pursuance of the regulations passed by the ordinance, the city inspectors were placed upon the work to supervise the use of explosives in the blasting of the rock. This they did for months until the plaintiff became dissatisfied with their action, and took the position stated above. The city solicitor, when called upon for his opinion, agreed with the plaintiff, holding that the ordinance and regulations did not apply to the work, and that the city inspectors were without jurisdiction in respect thereto. In consequence thereof, the city inspectors were withdrawn from the work and it proceeded without them, until the complaints of property holders and persons living in the vicinity of the blasting became so urgent and alarming, that the Mayor, after visiting the scene of the operations, and after personally investigating the complaints,

determined that the blasting should not go on except under the supervision of the city inspectors, and he notified the Marshal or Chief of Police to arrest any employee of the plaintiff who attempted to blast the rock unless done under the supervision of the inspectors.

This resulted, as the record discloses, in a visit from the counsel of the plaintiff to the Mayor. At the conference between them, it was arranged that the plaintiff should proceed with the work under the supervision of the inspectors, which was thereafter done. The question of the city's liability thereunder, and the extent of such liability, if liable, was not involved in the arrangement so made. The Mayor was impressed that under the circumstances and the provisions of the ordinance, he was authorized and justified in taking the position he did in the interests of the residents and property holders of that community.

The claim of the plaintiff that the work was not proceeding in accordance with the terms of the contract, was at such time known to the engineer of the Commission, and with such knowledge, he, in each of the monthly estimates that followed, certified that the work, to that time, had been done in accordance with the terms of the contract, and that the plaintiff was entitled at such time to the amount named in its certificate. This amount was paid to and received by the plaintiff, without protest or reservation, so far as the record discloses, in payment for the work so done by it.

These estimates were followed by the final estimate, dated October 15th, made after the work had been fully completed, to which a certificate was thereto attached, in which the engineer of the Sewerage Commission again stated that the work had been done in accordance with the contract, naming the amount of compensation therefor to which the plaintiff was entitled and for which he had not been paid.

It was not until November 7th, nearly a month thereafter, that the plaintiff wrote to the engineer, in which it for the first time, so far as the record shows, disclosed to the engineer an intention of making a claim for additional charges,

incurred by it because of the alleged restrictions and interference of the defendant.

In the letter of November 7th, the plaintiff wrote Mr. Hendrick, "we have receipted this estimate in the usual manner, but we desire to call your attention to the fact that in doing so, we do not waive * * * our claim against the city for increased costs, due to the acts of the city in changing, without our consent, the manner of blasting, in requiring the blasting to be done in a manner at variance with the terms of the contract. In other words, in receipting this estimate, we reserve the right to contend at the proper time that the city has abro· gated this contract by requiring us to do the blasting in a manner different from that provided for by the terms of the contract, * * * not upon the basis of compensation prescribed by the contract but upon force account, etc."

At the time this letter was received, the engineer of the Sewerage Commission, who, by the provisions of the contract, was to settle all disputes between the parties relating to the same, had, by his certificate of October 15th, 1910, decided the question mentioned in the letter, as well as all other questions arising under the contract involving the proper performance of the work in accordance with the terms of such contract.

In view of these facts, we can not conceive how this letter or the reservations contained in the receipts can be regarded as establishing an agreement between the parties that the question raised was "to be determined in some other manner than by the action of the said chief engineer." The letter was never answered, so far as the record discloses, and using the expression of the plaintiff, "this was the last word upon the subject."

If there was any doubt as to the meaning of the contract, it arose from the provisions of the contract itself, in which the plaintiff had agreed with the defendant that "to prevent disputes and litigations the engineer * * * shall decide all questions in relation to said work and the performance thereof, and shall in all cases decide every question which may

arise relative to the fulfillment of the contract on the part of the contractor."

The question of the City's liability being a question arising under the provisions contained in the contract, it, as well as the further question, whether there was a loss sustained by the plaintiff because of the alleged instructions and interference of the City Inspectors, was to be determined by the Engineer, for there could be no recovery unless it was found that by reason of such conduct on the part of the defendant, the plaintiff had suffered loss.

These being questions for the determination of the Engineer of the Sewerage Commision, they were decided by him, as shown by his certificate, to which reference has been made; and his decision thereon was final, as shown by the provisions of the specifications, in which it is provided that "his determination, decision and estimate shall be final and conclusive, and in case any question shall arise between the parties touching the contract, such determination, decision and estimate shall be a condition precedent to the right of the contractor to receive any moneys under the contract." *M. & C. C. of Baltimore* v. *Poe, etc., Receivers,* 132 Md. 637; *M. & C. C.* v. *Ault,* 126 Md. 423; *M. & C. C.* v. *Talbott,* 120 Md. 363; *Hewes* v. *Model Stoker Co.,* 124 Md. 289; *Pope* v. *King,* 108 Md. 37; *Lynn* v. *B. & O. R. R. Co.,* 60 Md. 414; 6 *Cyc.* 40.

Holding as we do that the plaintiff's right to recover in this case is confined to the unpaid balance of contract price, certified by the Engineer of the Sewerage Commission as due by the defendant to the plaintiff ($642.36), with or without interest as the tribunal trying the case may determine, it becomes unnecessary for us to consider and pass upon the other questions presented by this appeal.

It, therefore, follows from what we have said the judgment will be reversed and a new trial awarded.

*Judgment reversed and new trial awarded, with costs to the appellant.*