492 A.2d 308

**JAMES JULIAN, INC.**

v.

**STATE HIGHWAY ADMINISTRATION, et al.**

**No. 946, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

May 10, 1985.

Scott A. Livingston, Washington, D.C. (Andrew F. Dempsey, Jr., Washington, D.C., on the brief), for appellant.

Andrea D. Johnson, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Robert B. Harrison, III and Nolan H. Rogers, Asst. Attys. Gen., Baltimore, on the brief), for appellee State Highway Admin.

Otho M. Thompson, Associate Sol. for Baltimore City, Baltimore (Benjamin L. Brown, City Sol. for Baltimore City, Baltimore, on the brief), for appellee Mayor and City Council of Baltimore.

Argued before MOYLAN and ALPERT, JJ., and JOSEPH I. PINES, Associate Judge of the Eighth Judicial Circuit, specially assigned.

ALPERT, Judge.

It is axiomatic that, within reasonable limits, parties to a contract may mutually select their remedies for breaches or differences arising out of the performance of the contract. In this appeal, we must decide whether the choice of words used by sophisticated parties in selecting the remedies

precluded the parties from litigation before exhausting the procedures provided in the contract. The sophisticated parties are James Julian, Inc., appellant ("Julian"), the Mayor and City Council of Baltimore ("the City") and allegedly the State Highway Administration, Department of Transportation of Maryland ("SHA").[1] We note with regret and a sense of ennui that even sophisticated parties occasionally disagree as to the meaning of the words they choose.

The contractual language delineated to settle future differences is set forth at length later in this opinion. As things came to pass, Julian sued the City and SHA for breach of contract, alleging over $12,000,000.00 in damages and, additionally, sought declaratory relief. The Circuit Court for Baltimore City granted motions raising preliminary objection filed by the City and SHA and dismissed Julian's amended declaration, finding in pertinent part that:

[1] the contract upon which Plaintiff alleges a breach is a City of Baltimore contract and the contract provisions require that the remedies under the contract must be exhausted ... [and]

[2] that the State Highway Administration was not a party to the contract, because this Court has found that the Interstate Division for Baltimore City is an agency of Baltimore City.

We agree with the trial court "that the remedies under the contract must be exhausted." We also agree "that the State Highway Administration was not a party to the contract" but not for the same reason assigned by the trial judge.

## FACTS AND PROCEEDINGS

Julian brought suit against the City and SHA for breach of contract. The contract at issue concerned the construction of the Martin Luther King, Jr. Boulevard, formerly

---

1. The SHA's alleged status as a party arose because a signature of a representative of the Interstate Division of Baltimore appeared on the contract. This will be discussed in detail *infra* (Issues II and III).

known as the Harbor City Boulevard. The primary factual allegations of appellant-plaintiff's suit are contained within Paragraphs 17 and 18 of the Declaration, which provide:

17. During performance of the work, Defendants breached the Contract. (Unless otherwise indicated, the term 'Defendants' means both State and City Defendants, jointly or severally.) They wrongfully failed to compensate the Plaintiff where, as set forth below, the Defendants were obligated to do so. Among other things:

(a) Defendants directed Plaintiff to perform extra work, beyond the requirements of the Contract.

(b) Defendants hindered Plaintiff's performance of the work.

(c) Plaintiff encountered differing site conditions from those indicated in the Contract documents.

(d) Defendants forced Plaintiff to accelerate the performance of the work.

(e) Defendants failed to coordinate the work between Plaintiff and other parties, especially utility companies such as Baltimore Gas and Electric Company.

(f) Defendants constructively changed the contract requirements.

(g) Defendants' actions and inactions delayed and disrupted Plaintiff's work.

(h) Plaintiff encountered variations in the estimated quantities of major pay items, which justified an equitable adjustment of the contract prices.

18. In the following circumstances, among others, the Defendant failed to comply with its duty to provide extra compensation and more details of the claims were formally filed with the IDBC on October 7, 1983:

(a) With respect to the utilities, the plans and specifications were defective. The plans called for installation of new utilities in the same place where the plans called for existing utilities to be maintained. Insofar as the plans contained numerous utilities conflicts, the Defendants breached the implied war-

ranty that the specifications are adequate for the intended purpose. Defendants directed Plaintiff to perform certain relocation and rearrangement of utilities and this was beyond the Contract requirements. The directives caused an increase in the cost and time for performance of the work for which Defendants are obligated to compensate Plaintiff.

(b) The Contract called for a 30"—36" watermain running approximately 65% of the length of the boulevard. Beginning shortly after notice to proceed, Defendants spent one year revising the specifications of this watermain. During this time, it was unreasonable and impracticable to construct the boulevard along the affected area. This caused a major shift in the construction sequence as well as a delay in completion of work. This caused an increase in the cost and time for performance of the work, for which Defendants are obligated to compensate Plaintiff.

(c) The Contract required Plaintiff to excavate for the box culvert. With respect to the material removed from excavation for box culvert, the contract called for Plaintiff to waste the material and to use borrow excavation as fill. Defendants changed the Contract requirements by directing that Plaintiff stockpile the material moved in excavation for box culvert for later use as tile. This hindered Plaintiff's work. It caused an increase in the cost and time for performance of the work, for which Defendants are obligated to compensate Plaintiff.

(d) The Contract indicated a certain quantity of topsoil for landscaping. Plaintiff's unit price bid was based on spreading certain costs over this quantity. This quantity turned out to have been negligently overestimated by Defendants' design consultant. During performance, the actual amount of topsoil required underran the quantity indicated by approximately 50%. This obligated Defendants to make an adjust-

ment in the unit price in order to compensate Plaintiff for the reduction in quantity.

(e) Plaintiff is entitled to extra compensation for Defendants' action taken with regard to work performed by subcontractors including, but not limited to:

(1) Taylor Topsoil, and

(2) HSC Engineering Corp.

The City and SHA filed Motions Raising Preliminary Objections. As we mentioned earlier, both motions were granted by the Circuit Court for Baltimore City. As to the City, the trial judge found that Julian had failed to exhaust its remedies under the contract. As to SHA, the trial judge also granted its motion, finding it was not a party to the contract because the Interstate Division for Baltimore City was a city agency.

The controlling provisions of the contract to construct the Boulevard are contained, in pertinent part, within Article 10.05 of the contract:

ARTICLE 10.05 CONTROL OF THE WORK

*Section 10.05–1 Authority of the Engineer*

1. To prevent misunderstanding and litigation, the Engineer shall decide any and all questions which may arise as to the quality and acceptability of materials furnished and work performed and as to the manner of performance and rate of progress of said work, and shall decide all questions which may arise as to the interpretation of any or all plans relating to the work and of the Specifications, and all questions as to the acceptable fulfillment of the Contract on the part of the Contractor; and the Engineer shall determine the amount and quantity of the several kinds of work performed and materials which are to be paid for under the Contract, and such decision and estimate shall be final and conclusive, and such estimate, in case any question shall arise, shall be a condition precedent to the right of the Contractor to receive any money due under the Contract. . . .

2. The decision of the Engineer shall be final and he shall have executive authority to enforce and make effective such decisions and orders as the Contractor fails to carry out promptly.

3. The Contractor doing work under the control of the Interstate Division for Baltimore City may, when disputes or litigations arise, request the Chief, Interstate Division for Baltimore City and the Director of Public Works of Baltimore City to referee, only in the case of questions that cannot be settled by their authorized representative on the project.

The decision, determination and/or estimate will be final and conclusive upon the Contractor.

*Section 10.05–16 Disputed Work and Claims*

Provision is made elsewhere in these Specifications to establish appropriate adjustments to quantities, prices and/or time allowances when necessary.... [I]t shall be the responsibility of the Contractor to promptly notify the Engineer of the existence of conditions which he feels differ materially from those described by the Plans and/or Specification. Where such notification has been given or where the Engineer finds it necessary to initiate changes as described in Section 10.04–3, the Engineer and the Contractor will negotiate appropriate adjustments.

. . . . .

If and when the Contractor concludes that the negotiations with the Engineer cannot yield what he considers to be an acceptable solution, he shall advise the Engineer that he is requesting a review by the Chief, Interstate Division for Baltimore City and the Director of Public Works, Baltimore City. His intention to file a claim for additional compensation and/or time allowance should be directed to the Engineer in writing. Complete documentation of the claim including supporting data shall be submitted....

The Chief, Interstate Division for Baltimore City and the Director of Public Works, Baltimore City shall jointly advise the Contractor of their finding or call for such

conference and/or additional written presentation as he considers necessary to make a judgment to the matter. In the latter case, their finding will be made within thirty (30) days of receipt of such verbal or written presentation.

.    .    .    .    .

The Chief, Interstate Division for Baltimore City and the Director of Public Works, Baltimore City findings will set forth, as appropriate, stipulation of additional time allowances, method of measurement and basis of payment for the work involved.

The joint decision of the Chief, Interstate Division for Baltimore City and the Director of Public Works, Baltimore City will be final. There may be no further appeal under the terms of this contract.

*Section 10.05–17 Promptness in Submission of Claims*

(a) Should the Contractor be of the opinion, at any time or times, that he is entitled to any additional compensation whatsoever (over and above the compensation stipulated in the Contract Documents or for quantities and/or amounts over and above the quantities and/or amounts allowed or approved by the Engineer) for damages, losses, costs and/or expenses alleged to have been sustained, suffered or incurred by him in connection with the project contemplated, he shall, in each instance, within five (5) days after such alleged damages, losses, costs and/or expenses shall have been sustained, suffered or incurred, make a written claim therefor to the Engineer....

(b) The provisions of the Section shall be held and taken to constitute a condition precedent to the right of the Contractor to recover; they shall also apply to all claims by the Contractor in any way relating to the complete project, and even though claims and/or work involved may be regarded as 'outside the Contract.'

(c) It is understood and agreed, however, that nothing in this Section shall be held or taken to enlarge in any way the rights of the Contractor or the obligations of the City under the Contract Documents.

Julian, obviously preferring the formalities of a judicial determination over the informality of the remedies under the contract, noted a timely appeal from the Order of Dismissal and seeks reversal asserting that:

    I.   The lower court erroneously barred this action for breach of contract until exhaustion of certain contract remedies.

    II.  In the absence of an evidentiary hearing, the lower court improperly granted the State's motion based on a finding of fact that the Interstate Division for Baltimore City is a City, rather than a State agency.

    III. The Interstate Division for Baltimore City is a State agency.

### I.

### EXHAUSTION OF CONTRACTUAL REMEDIES

A.  *The Claims—Do They "Arise Under" The Contract?*

Julian contends that the remedies under the contract only govern claims "arising under" the contract and therefore do not apply herein because its cause of action is for breach of the contract.[2] The City, although seemingly addressing the same issue of contractual remedies, responds that Julian's claims must be "arbitrated" in accordance with the contract provisions. The City, citing *Southern Maryland Hospital Center v. Edward M. Crough, Inc.*, 48 Md.App. 401, 406, 427 A.2d 1051, *cert. denied*, 290 Md. 721 (1981), argues further "that when the arbitration agreement is 'clear and precise'[,] ... any controversy arising out of the agreement

---

**2.** *Cf.* § 10.05–17(b) which provides that that particular section, which addresses additional compensation claimed generally, applies "to all claims by the Contractor in any way relating to the complete project, and even though claims and/or work involved may be regarded as 'outside the Contract'." Because we find *infra* that all of the breaches alleged by appellant fall within the purview of the Contractual remedy provisions, we need not address the effect of this broad language.

or breach thereof shall be settled by the arbitration procedure...."

How ever we view the remedies provided by Article 10.05 of the agreement, we must first determine whether the thirteen items claimed by Julian were indeed intended to be decided by the engineer or other referee, or if they are outside of the purview of the contractual remedies. If the disputed items are outside the purview of the contractual remedies, then there are no pre-litigation remedies to be exhausted. Conversely, if the items clearly fall, as we believe they do, within the four corners of the contractual remedies, then they must, at the very least, initially be determined in a non-judicial proceeding, be it styled arbitration or otherwise.

Julian contends that there is a significant distinction between a claim "arising under" a contract and a judicial action for breach of contract. We do not disagree with this assertion and, in fact, recognize that the underlying principles must be applied to the allegations in this case for if any alleged breach did *not* "arise under" the contract, then the lower court would have erred. Provisions for remedy (disputes clauses) have come under scrutiny with some degree of frequency in the federal courts because of contract disputes with the United States governmental agencies. As the United States Court of Claims recognized in *Morrison-Knudsen Co., Inc. v. United States*, 345 F.2d 833, 170 Ct.Cl. 757 (1965): "In the broad sense, every failure by the government to comply with its contractual obligations is a breach of contract.... But we know that this is not so." The Court of Claims went on to note that if "complete relief is available to the contractor under the provisions of the contract ..., the action is not one for ... breach of contract." *Id.* 345 F.2d at 837 (citations omitted). *See also United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 404 n. 6, 86 S.Ct. 1545, 1551 n. 6, 16 L.Ed.2d 642, 651 n. 6 (1966) ("When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to

claims for relief under the contract.") (citing *Morrison-Knudsen* with approval).

*Morrison-Knudsen* arose out of a contract between that company and the Alaska Road Commission of the Department of the Interior for the grading and draining of a section of highway in Alaska. The plaintiff-contractor filed a claim for the increased costs of finishing the subgrade of the road, seeking an equitable adjustment under the changes clause or damages for breach of contract. It also made claim for increased costs resulting from "the shut down for the winter of 1954–1955." *Id.* 345 F.2d at 835. All of the claims at issue were initially presented to the contracting officer, and later appealed to the Interior [Department] Board of Contract Appeals ("IBCA") after the contracting officer granted partial relief to the contractor. The IBCA granted relief on two claims. As to a third claim for increased costs, the IBCA noted that it lacked jurisdiction to decide the claim but nevertheless included detailed findings of fact on the issue. 345 F.2d at 835. The issue on appeal was whether the contractor was entitled to a *de novo* trial as to those facts found by the IBCA on the third claim, the claim it found to be beyond its authority. *Id.* at 836. The court held that the findings of fact were "gratuitous and such findings do not preclude or limit a trial *de novo* on the merits of the claim." *Id.* at 838.

■ Following the rationale of *Morrison-Knudsen*, if complete relief is available to Julian under the provisions of the contract, then there can be no collateral action for breach of contract. This principle was succinctly stated in another case before the United States Court of Claims, *Bird & Sons, Inc. v. United States*, 420 F.2d 1051, 1055, 190 Ct.Cl. 426 (1970) (emphasis in original):

> To the extent that complete relief is available under a specific provision—*i.e.*, the claim is both cognizable under and adjustable by the terms of the contract—such as the currently standard 'Changes', 'Changed Conditions', or 'Inspection' clauses, the controversy arises under the

contract and is subject to initial administrative resolution as provided in the normal 'Disputes' article. But *if a fair reading of the particular contract shows that the specific dispute has not been committed to agency decision, the claims are then for a 'pure' breach of contract and are considered de novo in this court.*

Applying the formula in *Bird & Sons* to the case *sub judice*, the "agency decision" would be that of either the engineer, the Department of Public Works, or another administrative official designated to decide the disputes under Article 10.05. Reviewing each of the thirteen alleged breaches of contract, we hold that relief clearly can be obtained under the provisions of Article 10.05.

| Breach alleged by Appellant: | Corresponding provision of Article 10.05: |
|---|---|
| Paragraph 17: [3] | |
| a. Extra work completed by appellant at appellees' direction | a. § 10.05–(17) (additional compensation generally) |
| b. Hindrance of appellant's work | b. § 10.05–(17) (additional compensation generally) |
| c. Encountering site conditions differing from plans. | c. § 10.05–(16) (additional compensation for differing site conditions) |
| d. Forced acceleration of work performance. | d. § 10.05–(1) (rate of progress determined by Engineer) |
| e. Appellees' failure to coordinate work between various companies at site. | e. § 10.05–(1) (amount and quantity of several kinds of work determined by Engineer) |
| f. "Constructive" change of contract requirements by appellees. | f. § 10.05–(1) (interpretation of plans by Engineer) |
| g. Delay caused by actions and inactions of appellees. | g. § 10.05–(1) (rate of progress determined by Engineer) |
| h. Variations in estimated quantities of major pay items. | h. § 10.05–(1) (quantity of materials determined by Engineer) |

---

**3.** These allegations are set forth in full *supra* at pp. 76–78.

| Breach alleged by Appellant: | Corresponding provision of Article 10.05: |
|---|---|
| **Paragraph 18:** | |
| a. Defective plans and specifications as to on-site utilities. | a. § 10.05–(1) (interpretation of plans) and 10.05–(17) (additional compensation generally) |
| b. Delays caused by defective specifications as to the watermain. | b. § 10.05–(17) (additional compensation generally) |
| c. Change in contract requirements as to materials excavated for box culvert. | c. § 10.05–(17) (additional compensation generally) and § 10.05–(16) (additional compensation for differing conditions)[4] |
| d. Decreased unit price for topsoil because of an overestimation of need by appellees. | d. § 10.05–(17) (additional compensation generally) |
| e. Extra compensation for work done by certain subcontractors, including Taylor Topsoil and HSC Engineering Corp. | e. § 10.05–(17) (additional compensation generally) |

## B. *The Remedy—Is It a Condition Precedent?*

██ Having decided that relief can be afforded by way of the remedies provided in the contract, we must now determine whether their implementation is a condition precedent to recovery of payment. We hold that it is.

We need not repeat the broad powers vested in the engineer as they are exhaustively set out earlier in this opinion. As conceded by appellant in its brief, "[t]he Engineer has 'the last word' on how the project will in fact be built." We believe that the parties, by the words they used in the contract, clearly agreed to submit their disputes first to the Engineer for resolution and then, if unresolved, to the Chief, IDBC. As a matter of fact, Julian apparently did just that. As argued in its brief, "[t]he parties attempted unsuccessfully to resolve the disputes. Julian then submitted the claims to the IDBC Engineer, the official autho-

---

**4.** In fact, a review of the correspondence provided in the City's brief indicates that Julian asserted the applicability of § 10.05–16 as to this topsoil claim.

rized to resolve claims under the Contract." That such language precludes recovery until the condition is performed is not without precedent in Maryland. In *Laurel Race Course, Inc. v. Regal Construction Co., Inc.*, 274 Md. 142, 154, 333 A.2d 319 (1975) the Court of Appeals, in a construction litigation case, reaffirmed the principle that "where a contractual duty is subject to a condition precedent, ... there is no duty of performance ... until the condition precedent is either performed or excused." [5] As in the instant case, the engineer in *Laurel* had broad responsibilities and powers. He had the authority to reject work and materials which did not conform to the plans, specifications and contract documents and to decide all engineering questions which arose in the execution of the work. Decisions of the engineer on questions pertaining to performance and execution of the work were controlling and unqualified. It was beyond question, held the Court, that payment of the balance due was expressly conditioned upon production of the engineer's "Final Certificate." Issuance of that certificate was to occur after the work was ready for final inspection, after the engineer found the work "acceptable" under the contract and when the contract was deemed "fully performed." Regal was not paid following a dispute over performance; hence, it filed suit against Laurel and judgment was eventually entered in Regal's favor. At trial, Laurel persisted in its contention, to no avail, that Regal failed to produce a certificate of the engineer as a condition precedent to liability of the written contract. The Court of Appeals, in modifying Regal's judgment, stated:

> Almost a century ago, our predecessors held in *Gill v. Vogler*, 52 Md. 663, 666 (1879), where work was 'to be done ... to the satisfaction of the City Commissioner [of Baltimore],' and payments during the progress of the

5. *See also Barnes v. Euster*, 240 Md. 603, 606, 214 A.2d 807 (1965); *Griffith v. Scheungrab*, 219 Md. 27, 34, 146 A.2d 864 (1958).

work were to be made only in accordance with his 'monthly estimates,' that those estimates were a condition precedent to recovery of such payments, absent bad faith or collusion.

From that holding has emerged the general rule, followed uniformly by decisions of this Court, that where payments under a contract are due only when the certificate of an architect or engineer is issued, production of the certificate becomes a condition precedent to liability of the owner for materials and labor in the absence of fraud or bad faith.... Apart from fraud or bad faith, the only other exceptions to this rule are waiver or estoppel.

274 Md. at 150, 333 A.2d 319 (citations omitted).

In the *Mayor & City Council of Baltimore v. Poe*, 132 Md. 637, 104 A. 360 (1918) the Court of Appeals addressed the effect of a disputes clause containing language quite similar to the language at issue in the instant appeal. 132 Md. at 641, 104 A. 360. Disputes were left to the architect or engineer, and "[i]n case any question shall arise between the contractor and the City touching the contract, the estimate or certificate and decision of the architect or engineer shall be a condition precedent to the right of the contractor to receive any moneys under the contract." *Id.* The Court held that "the decision of such person shall be final and conclusive upon parties to the contract, provided the decision concerns matters within the scope of submission, and is not subject to review by the courts, if made by the third party in the absence of fraud or bad faith." *Id.* at 643, 104 A. 360.[6] Adherence to conditions precedent (as distinguished from arbitration), thus, have long been recognized in Maryland.

---

**6.** *See also Mayor & City Council of Baltimore v. M.A. Talbott Co.,* 133 Md. 226, 105 A. 149 (1918); *Mayor & City Council of Baltimore City v. Clark,* 128 Md. 291, 97 A. 911 (1916); *Mayor & City Council of Baltimore City v. M.A. Talbott & Co.,* 120 Md. 354, 87 A. 941 (1913).

Although there is no record of the in-chambers arguments, we note from the record that the trial judge had before him some thirty-eight exhibits. Some of the exhibits indicate an attempt on the part of Julian to resolve its claims. On the record before us, apparently to this very day "[t]he claims remain unresolved" and are yet to be finally determined by the engineer and/or Chief IDBC. Until such determination is made, the condition precedent is not satisfied—the contractual remedy is not exhausted. The trial judge did not err in his decision.

## II and III

## THE STATE AS A PARTY TO THE CONTRACT

The entire thrust of Julian's appeal is aimed at making the contract a "State contract" in order to bring it within the ambit of the State Procurement Act, Art. 21, § 7–201 (1981 Repl.Vol.) Although the trial judge specifically found that the Interstate Division for Baltimore City ("IDBC") was an agency of the City, Julian has continually asserted, and the appellees essentially agree, that the IDBC is an agency of the State of Maryland.[7] Without so deciding, we shall, for the purposes of this appeal only, consider the IDBC as an agency of the State. If, however, the IDBC[8] is not a party to the contract, then under no circumstances could the subject contract fall within the purview of the State Procurement Act.

Although the trial judge was procedurally premature in

---

**7.** The IDBC was created by a March 15, 1966 agreement between the then State Roads Commission of Maryland and the City. The IDBC came into existence on April 1, 1966 "to manage the construction and completion of the Interstate System within the City." Various bureaus were created and their duties enumerated in the agreement. The activities of each bureau were to be coordinated by the chief of the IDBC. All related costs were to be assumed by the City.

**8.** The trial judge found that the SHA was not a party to the contract because he believed it was an agency of Baltimore City; however, we will examine this issue from the vantage point of the IDBC because the signature which appears on the contract belongs to a representative of the IDBC.

deciding that the IDBC was a City agency,[9] pragmatically he may not have been far from the mark. We believe that the IDBC, although not a City agency *per se*, could and did function as an agent of the City for certain limited purposes. We shall explain.

The Federal Highway Act of 1956, as codified at 23 U.S.C. § 101 (1976)[10] was

> declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

The Federal Highway Act encompasses various types of projects, including the "Interstate System." 23 U.S.C. § 103(e)(1) (1976).[11] Pursuant to the statute, such routes are located "by joint action of the State highway department of each State and adjoining States, subject to the approval by the Secretary...." *Id.* Although the Act speaks primarily in terms of the federal and state governments, local participation is recognized.[12] 23 U.S.C. § 110(b) (1976) provides:

> (b) The Secretary may rely upon representations made by the State highway department with respect to the arrangements or agreements made by the State highway

---

9. Although it was unnecessary to decide that question, an evidentiary hearing should be conducted when an issue of that kind indeed must be decided.

10. The 1976 Code was applicable at the time of the contract at issue herein, and we shall accordingly rely upon it.

11. Although not specifically stated in the brief or record extract by statute section, the Harbor City Boulevard is referred to frequently as an Interstate System.

12. *See, e.g.,* 23 U.S.C. § 105(d) (1976) which requires that programs under the Federal-aid urban program "be selected by the appropriate local officials with the concurrence of the State highway department...."

department and appropriate local officials where a part of the project is to be constructed at the expense of, or in cooperation with, local subdivisions of the State.

As to the actual construction of the highway, 23 U.S.C. § 114(a) (1976) provides: "The construction of any highways or portions of highways located on a Federal-aid system shall be undertaken by the respective State highway departments or *under their direct supervision.*" (emphasis added).[13] This is the "route" followed in the instant case.

The City of Baltimore and the SHA entered into a series of contracts, the later being a renewal of the earlier, establishing the IDBC.[14] Initially, the agreement of February 24, 1977 applied; however, it was soon superseded by an agreement dated August 9, 1978. In the 1978 agreement, the City proposed the construction of the Boulevard, at no expense to the State, by using Federal-Aid Funds. Certain conditions were set forth in the agreement, as required by a policy manual:

> WHEREAS, Federal-Aid Highway Program Manual No. 6–4–1–6 dated September 10, 1976 sets forth procedures whereby services and facilities of local government may be utilized and requires that there be an executed agreement between State Highway Administration and local agency, setting forth conditions under which project would be constructed;

> WHEREAS, CITY concurs that the construction can be performed under the direction of STATE; and

---

**13.** *See also* 23 U.S.C. § 302(b) (1976):

> (b) The State highway department may arrange with a county or group of counties for competent highway engineering personnel suitably organized and equipped to the satisfaction of the State highway department, to supervise construction and maintenance on a county-unit or group-unit basis, for the construction of projects on the Federal-aid secondary system, financed with secondary funds, and for the maintenance thereof.

**14.** *See supra* note 13 for an explanation as to the creation of the IDBC.

WHEREAS, CITY agrees to participate in financing of project to the extent of all costs in excess of Federal reimbursement; and

WHEREAS, STATE and CITY find that the Interstate Division is adequately staffed and suitably equipped to contract for completion of the work, subject to the approval of the STATE to the end that the work is satisfactorily completed in an economic and expeditious manner; and

WHEREAS, CITY desires and is willing to cooperate with STATE in carrying out objectives of the Federal-Aid Highway Act, all in accordance with the regulations, policies and procedures of the Federal Highway Administration; and

WHEREAS, CITY allows storage and/or passage under viaduct, overpass and/or underpass, storage and/or passage shall be subject to reasonable regulation by the Director of Public Works of Baltimore City to protect the Highway Structure(s) from collision, fire, explosion or similar hazards; & the Federal-Aid Highway Program Manual No. 7–4–3–Management of Air Space.

Under this agreement, the City assumes primary responsibility, both financial and otherwise,[15] for the project, but also subjects itself to supervision by the State. This State supervision was, however, at the City's expense. The IDBC worked with the City and its activities were also subject to State approval. The IDBC was specifically charged with the responsibility of supervising the preparation of plans, designs and estimates, subject to prior approval of the City, State and Federal Highway Administration. All in all, the construction project involved a great deal of interplay between the City, State and Federal governments, with the State's involvement limited to consulting and/or supervis-

---

15. In fact, the agreement between the City and State contains an indemnification clause wherein the City agreed "to save the State harmless from all law or equity suits for or on account of the construction" not caused by negligence on the part of the State.

ing. Although the Federal Highway Act speaks specifically to project agreements between the Secretary (of the United States Department of Transportation) and the State highway department,[16] the collateral agreement between the State and the City, coupled with the construction contract "by and between James Julian, Inc. hereinafter called the Contractor and the Mayor and City Council of Baltimore, a municipal corporation, hereinafter the City", suggests that the State was nothing more than a supervisor. The City shouldered the ultimate responsibility; hence, in a sense, the State acted as an agent or liaison between the City and the Federal governments, as opposed to a party to the contract.

A plain reading of the text of the construction contract indicates that it is a contract between the City and Julian as they are the only parties listed in the text. The issue as to whether the State is a party to the contract arose as a result of the signature page. The signatures appeared essentially as follows:

ATTEST:                              JAMES JULIAN, INC.

/s/   Frank J. Julian                      [Stamp]
        Secretary

/s/
        Deputy Treasurer         /s/   James Julian
                                        [Presidential stamp]

                                 /s/
                                        Mayor of Baltimore City

APPROVED AS TO FORM AND
LEGAL SUFFICIENCY

/s/                    (Approved)
        Assistant City Solicitor

---

16. *See* 23 U.S.C. § 110(a) (1976).

/s/ _____
   Chief, Interstate Division
   for Baltimore City        /s/ _____
                                  Director of Public Works
                                  City of Baltimore

■ It appears that the representative of the IDBC signed the agreement only for approval as to form and legal sufficiency and not as a party. Moreover, the IDBC is not mentioned as a party within the text of the contract. If in fact the IDBC signed only for approval as to form and legal sufficiency, then its signature in that limited capacity would not make it a party. To remove any question as to the purpose of the IDBC signature, we shall nevertheless address the status of the IDBC as though the words "APPROVED AS TO FORM AND LEGAL SUFFICIENCY" did not apply to the IDBC. As often stated by the Maryland courts: "The cardinal rule in the construction and interpretation of contracts is that effect must be given to the intention of the parties, unless it is inconsistent with some established principle of law." *Kasten Construction Co., Inc. v. Rod Enterprises, Inc.*, 268 Md. 318, 328, 301 A.2d 12 (1973) (citations omitted). It is also well settled that the construction of a written contract is ordinarily considered to be an issue of law for resolution by the trial judge. *See generally Allen Engineering Corp. v. Lattimore*, 235 Md. 182, 186, 201 A.2d 13 (1964). Included within such a decision is a determination as to who are the parties to a contract. Although we were unable to uncover a Maryland decision exactly on point, other jurisdictions have held that the mere presence of a person's signature on a contract is not sufficient to hold that person liable as a party. In *Nutrena Mills, Inc. v. Earle*, 14 Wis.2d 462, 111 N.W.2d 491 (1961), an agricultural contract was at issue and the question before the court was whether the respondent had signed the contract as a "grower" or merely as a witness. The problem arose because the disputed signature appeared after a blank space for a "grower," however, the respondent was not referenced as a grower within the body of the contract. The Supreme Court of Wisconsin stated that one must look to the intent of the parties to determine a

signator's status. 111 N.W.2d at 493. The Court reasoned that the fact that the respondent was not mentioned within the text of the contract "impliedly excluded" her from the class of grower. *Id.* The Court delineated the general rule as follows:

> [W]hen the body of a contract purports to set out the names of the parties to the contract, and a person not named therein signs the contract, and there is nothing to indicate that such person signed as a party, such person is not bound.

*See also Mersereau v. Whitesburg Center, Inc.*, 47 Ala. App. 146, 251 So.2d 765, 770 (Ala.Civ.App.1971) (signature of a person not named in the contract does not make it the contract of that person).

We agree with the rationale of the cases cited above and therefore hold that the mere presence of an IDBC official's signature on a contract which is clearly "by and between" Julian and the City, is not sufficient to make the IDBC a party. Accordingly, Judge Ward was correct in finding that the contract at issue was not a state contract, albeit for a different reason. Nothing in the text of the contract suggests otherwise, and, absent an ambiguity, the contract's "plain meaning will be given effect." *Aetna Casualty & Surety Co. v. Insurance Commissioner*, 293 Md. 409, 420, 445 A.2d 14 (1982). Because extrinsic evidence would not be admissible [17] in this instance, the trial judge was clearly empowered to make a legal determination, a determination with which we concur.

## DECLARATORY JUDGMENT

The trial judge, although not explicitly issuing a declaratory judgment as requested by Julian, implicitly declared that because the State Highway Administration was not acting in its capacity as a State agency, the State Procurement Act was not applicable. As we have held that the

---

17. *See generally Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 433, 418 A.2d 1187 (1980).

State was not a party to the subject contract, it is manifest that the State Procurement Act is inapplicable. *See* Md. Ann.Code art. 21 § 7–201 (1981 Repl.Vol.).

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.