982 A.2d 876

**GEBHARDT & SMITH LLP**

v.

**MARYLAND PORT ADMINISTRATION.**

No. 1326, Sept.Term, 2008.

Court of Special Appeals of Maryland.

Oct. 29, 2009.

---

534

Lawrence J. Gebhardt, Patrick J. Madigan (Gebhardt & Smith, LLP on the brief), Baltimore, for appellant.

Philip P. Whaling (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: SALMON, ZARNOCH and GRAEFF, JJ.

GRAEFF, J.

This appeal arises from a dispute between Gebhardt & Smith LLP ("Gebhardt & Smith"), appellant, and the Maryland Port Administration ("MPA"), appellee, over a lease ("Lease") for office space in the Baltimore World Trade Center ("WTC"). The Lease required that the tenant, Gebhardt & Smith, pay to the landlord, the MPA, base rent plus a proportional share of the building's operating expenses. In 2003, a dispute arose regarding the charges for operating expenses. Gebhardt & Smith continued to pay its base rent, but it did not pay the invoices for operating expenses.

Suit was instituted in the Circuit Court for Baltimore City. Following a bench trial, the circuit court found that Gebhardt & Smith breached the Lease, and it entered a judgment in favor of the MPA for $328,186.88, plus interest.

Gebhardt & Smith appealed, and it presents two questions for our review, which we have rephrased:

1. Did the Lease contain a condition precedent to Gebhardt & Smith's obligation to pay its share of operating expenses, and if so, was this condition satisfied?

2. Where the Lease provided that the determination of operating expenses by "Lessor's certified public accountant" "shall constitute a final determination," was Gebhardt & Smith precluded from challenging the operating expenses in court?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Gebhardt & Smith, a law firm, leased office space from 1977 until 2006 in the WTC, an office building operated by the MPA and located in Baltimore, Maryland. In 1992, the parties

executed the Lease at issue, with Gebhardt & Smith renting 30,161 square feet of office space on three floors of the WTC. Gebhardt & Smith agreed to pay $49,011.63 per month in base rent, plus its proportional share of "additional rent," which was comprised of "real estate taxes" and "operating expenses." [1]

Article 4 of the Lease defined "operating expenses" as follows:

The term "operating expenses shall mean any and all costs and expenses (except real estate taxes) paid, incurred, or charged by Lessor in connection with the operation, servicing and maintenance of the building, including, but not limited to, the following:

1) Wages and salaries and costs of employee benefits of employees or independent contractors engaged in the operation and maintenance of the building, including Lessor's Social Security Taxes and any other governmental taxes which may be levied on such wages and salaries;

2) All charges and rates connected with water supplied to the building and related sewer use charges;

3) All charges connected with heat and air conditioning supplied to the building;

4) The cost of labor and material for cleaning the building, surrounding areaways and windows in the building;

5) The cost of all electric current supplied to the building;

6) The cost of fire; casualty, liability and such other insurance customarily provided in connection with an office building.

---

1. The parties amended the Lease on three occasions. On September 28, 1995, the parties executed a first amendment to the Lease, which made two changes: (1) it extended its termination date to September 30, 2000; and (2) the base rent was decreased to $44,211 per month. On March 23, 2000, the parties executed a second amendment to the Lease, which made similar changes: (1) it extended its termination date to September 30, 2007; and (2) the base rent was increased to $51,902.05 per month. On May 19, 2005, the parties executed a third amendment to the Lease, which changed the termination date of the Lease to September 30, 2006.

The term "operating expenses" shall include only reasonable and bonafide expenses actually incurred by Lessor and shall not include any of the following: depreciation, administrative overhead expenses, leasing commissions, management or rental agents fees, capital expenditures (which shall include, without limitation, the cost of renovating, decorating or otherwise preparing space in the building for tenants), or any other expenses relating to the ownership and management, as distinguished from the operation, of the building.

Article 4(c) of the Lease, which was included in an addendum, identified how operating expenses would be billed to Gebhardt & Smith:

In the event that the operating expenses incurred by Lessor during any fiscal year following the base year shall exceed the operating expenses incurred by Lessor during the base year Lessee shall pay to Lessor as additional rent for such fiscal year an amount equal to The Percentage [2] of the excess. In the month of June in the base year and each fiscal year thereafter, Lessor shall furnish to Lessee a statement of the estimated operating expenses for the forthcoming fiscal year compared with the base year and shall compute Lessee's estimated additional rent for such fiscal year as provided herein. If the estimated operating expenses for said fiscal year exceed the operating expenses during the base year Lessee shall pay each month in addition to the base year specified in Article 2 hereof an amount equal to one-twelfth (1/12) of the Percentage of the excess. When the statements of the actual operating expenses for such fiscal year are issued by the State Legislative Auditor's Office or Lessor's certified public accountants, if the estimated additional rent paid by Lessee exceeds Lessee's Percentage of the excess operating expenses, Lessor shall promptly either refund the overpayment to Lessee

---

**2.** The Lease defined "The Percentage," as 11.0149 percent, which constituted the ratio of "the gross rentable area of the Leased Premises [ ] to the total gross rentable area of the building."

or credit the amount thereof against subsequent payments of additional rent under this paragraph c. If the estimated additional rent paid by Lessee is less than Lessee's Percentage of the excess operating expenses[,] Lessee shall pay the additional rent due within ten (10) days after receipt of a statement therefor from Lessor.

Article 4(d) of the Lease is the provision central to this appeal. It provided that the statements of operating expenses to be furnished by Lessor "shall be as determined by Lessor's certified public accountant" and that the statements furnished "shall constitute a final determination" of the amount of operating expenses owed by Gebhardt & Smith to the MPA. This provision provided as follows:

> The Statements of the real estate taxes and operating expenses to be furnished by Lessor as provided in subdivisions (b) [referring to Real Estate Taxes] **and (c)** [referring to operating expenses] above **shall be as determined by Lessor's certified public accountant** xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx. The statements thus furnished to Lessee **shall constitute a final determination** as between Lessor and Lessee of the real estate taxes and operating expenses for the periods represented thereby.[3]

(Emphasis added).

In a letter dated November 8, 2002, the WTC Building Manager advised Gebhardt & Smith that, for the fiscal years ending in 2000 or 2001, there was no increase in the operating expenses:

> We have received the final Auditor's report for the actual operating expenses for the World Trade Center for Fiscal Years ending June 30, 2000 and June 30, 2001. These

---

**3.** The xs appear in the Lease. James Smith, Managing Partner with Gebhardt & Smith, testified that the part x'd out of the Lease "was a reference to generally accepted accounting principles." He testified that the Lease did not contain a specific accounting standard that MPA was required to follow.

expenses for Fiscal Years 2000 and 2001 were audited and certified by an independent public accountant.

By this letter, we will adjust the estimated operating expenses per Article 4c of your Lease for the Fiscal Year ending June 30, 2003. . . .

The letter advised, however, that the estimated operating expenses for fiscal year 2003 increased, and Gebhardt & Smith was obligated to pay its proportional share of that increase, $17,871.12.[4] Mark Gaspar, Administrative Partner with Gebhardt & Smith, testified that the firm paid this bill without protest or request for additional information because "it was a small amount" and "the letter represented ... that the expenses had been audited and certified by an independent public accountant."

In September 2003, Hurricane Isabel flooded the WTC and the building was closed from September 19, 2003, until November 10, 2003. During this time, Gebhardt & Smith vacated its offices, moved its files and computers out of the building, and occupied temporary office space to continue operating its law practice.

While Gebhardt & Smith was displaced from the WTC, it received a letter and an invoice for actual operating expenses for fiscal year 2002 and estimated operating expenses for 2004. The letter again indicated that the MPA had received "the Auditor's report for the actual operating expenses" and, similar to the previous year, stated that the expenses "for fiscal year 2002 have been audited and certified by an independent public accountant."[5] The letter informed Gebhardt & Smith that, for fiscal year 2002, it owed an additional $22,854.38 for actual operating expenses over what Gebhardt & Smith had paid for estimated operating expenses. In addition, Gebhardt & Smith owed $33,512.28 for estimated operating expenses for

---

4. Gebhardt & Smith had a credit of $12,989.04.

5. This letter, although unsigned and not on letterhead, was admitted into evidence without objection.

fiscal year 2004. An invoice indicated that Gebhardt & Smith owed MPA a total of $56,366.66.

Upon receipt of the invoice, Mr. Gaspar testified that he was "shocked" because "rent was supposedly being abated at that point," as a result of the firm's displacement from the WTC due to Hurricane Isabel, and "the invoice was requesting payment of $56,000 right away." Mr. Gaspar took the bill to Jim Smith and Larry Gebhardt, two of the firm's partners.[6]

In a letter dated December 29, 2003, Gebhardt & Smith responded to the WTC's building manager regarding the bill it received for actual and estimated operating expenses:

We have received your letter of December 22, 2003 relating to the World Trade Center's operating expenses for fiscal 2002 and its estimated operating expenses for fiscal 2003. Your letter, together with its attachment, expresses the Maryland Port Administration's contention as to Gebhardt & Smith['s] responsibility for a percentage of these actual and estimated operating expenses under the terms of the Lease. Gebhardt & Smith, however, has significant concerns-and potentially substantial disagreements-with the Maryland Port Administration's computation of the amounts claimed due as actual operating expenses for fiscal 2002 and the estimated operating expenses for fiscal 2003.

* * *

Tenants are responsible solely for operating expenses incurred in connection with "the operation, servicing, and maintenance of the building." Tenants are not responsible for expenses in connection with the management and ownership of the building. For this reason, Gebhardt & Smith requests a detailed and comprehensive breakdown of all of the items comprising the categories of purported operating expenses set forth in the Ernst & Young Schedule of Actual

---

**6.** A subsequent letter from the WTC Building Manager advised that Gebhardt & Smith was assessed "a credit of $4,840.66 related to the period of rent abatement."

Operating Expenses for the fiscal year ending June 30, 2002. Gebhardt & Smith wishes to verify and satisfy itself that the operating expenses aggregated in the schedule are authorized operating expenses under the terms of the Lease, as contrasted to expense of ownership and management. . . .

\* \* \*

Gebhardt & Smith has substantial concerns about whether the Maryland Port Administration has made an accurate, good faith estimate of the operating expenses which it legally, under the terms of the Lease, is entitled to pass on to the tenants as additional rent.

In a letter dated January 30, 2004, the WTC's building manager responded to Gebhardt & Smith's letter and provided Gebhardt & Smith with documentation regarding the actual and estimated operating expenses. WTC's building manager attached two reports prepared by Ernst & Young, LLP ("Ernst & Young"), an accounting firm, for the fiscal years ending June 30, 2001, and June 30, 2002.

The first report, which covered the fiscal year that ended on June 30, 2001, stated that Ernst & Young "audited, in accordance with auditing standards generally accepted in the United States, the general purpose financial statements of the Maryland Department of Transportation as of and for the year ended June 30, 2001." The report explained that its "audit was made for the purpose of forming an opinion on the general purpose financial statements of the Maryland Department of Transportation taken as a whole" and "to meet the reporting requirements of the World Trade Center standard lease agreement. . . ." The report then identified the following operating expenses: (1) utilities costing $1,064,288; (2) maintenance costing $752,104; (3) janitorial costing $447,172; (4) security costing $280,490; (5) insurance costing $59,718; and administration costing $73,983.

The second report, which covered the fiscal year that ended on June 30, 2002, stated that Ernst & Young "audited, in

accordance with auditing standards generally accepted in the United States, the basic financial statements of the Maryland Department of Transportation as of and for the year ended June 30, 2002." The report continued:

> The information set forth in the accompanying Schedule, which is the responsibility of the Maryland Department of Transportation's management, is presented for purposes of additional analysis and to meet the reporting requirements of the World Trade Center standard lease agreement and is not a required part of the basic financial statements of the Maryland Department of Transportation. As described in Note 1, the Schedule referred to above has been prepared in accordance with the basis of accounting as defined by Article 4 of the Standard World Trade Center Lease Agreement, which Agreement requires reporting expenses at amounts that vary materially from those which would be reported if presented in conformity with accounting principles generally accepted in the United States.[7] The Schedule is not intended to be a complete presentation of operating expenses in conformity with accounting principles generally accepted in the United States or other comprehensive basis of accounting. The information set forth in the accompanying Schedule has been subjected to the auditing procedures applied in our audit of the basic financial statements and, in our opinion, is fairly stated in all material aspects in relation to the basic financial statements taken as a whole.

The report then identified the following operating expenses: (1) utilities costing $1,006,724; (2) maintenance costing $764,841; (3) janitorial costing $548,888; (4) security costing 393,372; (5) insurance costing $95,105; and (6) administration costing $76,311.

---

7. Note one provides, among other things, that "[t]he Schedule of Standard Operating Expenses is prepared on the basis of accounting as defined by Article 4 of the standard World Trade Center lease agreement." The testimony indicated that the basis of accounting was the definition of operating expenses from the Lease.

Upon reviewing the reports created by Ernst & Young, Mr. Gaspar concluded that Ernst & Young had not issued "a standard audit opinion" because "it simply states that they've audited the financial statements of the Department of Transportation without indicating that they've done anything to review the financial statements of the Port Administration itself." Moreover, Gebhardt & Smith concluded that the audit was insufficient because Ernest & Young "had not determined the operating expenses that they're required to under the lease." The reports did not indicate that the auditor "reviewed the backup information," and Gebhardt & Smith believed that the auditor "should have gone back to the Maryland Port Administration's records to review their invoices" and the lease "to determine what categories of expenses are properly passed onto tenants." Consequently, Gebhardt & Smith refused to make any further payment of operating expenses because "we wanted more information to show that they were going to calculate the amount based on what's required under the lease and we never received that [information]."

The MPA continued to send statements regarding Gebhardt & Smith's share of the operating expenses.[8] Gebhardt & Smith did not pay any bills for operating expenses from 2004 to 2006.

In 2006, Gebhardt & Smith decided to file suit due to concerns "that if [Gebhardt & Smith] actually did owe money it was building up," and Gebhardt & Smith "felt that was the only way that we could force the state to actually give us some

---

8. In a letter dated September 29, 2004, the MPA informed Gebhardt & Smith that it owed an additional $41,156.85 for fiscal year 2003, and that it owed $69,641.15 for estimated operating expenses for fiscal year 2005. In a letter dated July 28, 2005, the MPA indicated that the actual operating expenses for fiscal year 2004 were $764.16 less than already billed. The letter advised that Gebhardt & Smith owed $106,100.48 for estimated operating expenses for fiscal year 2006. In a letter dated May 31, 2006, the MPA stated that Gebhardt & Smith owed an additional $28,270.07 for actual operating expenses for fiscal year 2005. The letter advised Gebhardt & Smith that it owed $114,121.53 for estimated operating expenses for fiscal year 2007.

proper calculation of what we owed." On April 6, 2006, Gebhardt & Smith filed a complaint in the Circuit Court for Baltimore City, requesting that the court issue a declaratory judgment to determine, among other things, "the actual operating expenses" for 2002 to 2006. Gebhardt & Smith alleged that, as a result of deficit concerns facing the State in 2003, the State decided to sell the WTC, and it "set out to increase the revenue generated by the building." Gebhardt & Smith contended that "the only avenue for MPA to generate additional revenue from the building was to increase the operating expense pass throughs that were billed to tenants as additional rent." It claimed that, "[b]y inflating the operating expenses passed on to the tenants, MPA could increase its profit from the leasing activity" and this would "deceptively make the building appear more profitable than it actually was and potentially enable the building to command a higher price upon its sale." Gebhardt & Smith cited costs for security and the apportionment of liability insurance as "egregious example[s]" of "inflated, improper and unauthorized charges[.]"

Gebhardt & Smith also requested that the court declare that it "is not responsible for paying its percentage of the increase in annual real property taxes that will result from MPA selling the World Trade Center to a person that is not tax exempt[,]" that "MPA is estopped from including the salary and benefits of MDTA Police as an operating expense[,]" and that Gebhardt & Smith "does not owe pre-judgment or contractual interest on the amount of any additional rent for increase in operating expenses for any fiscal year after the base year that may be its obligation under the lease[.]"

On June 30, 2006, MPA filed an answer and a counterclaim. The counterclaim alleged that Gebhardt & Smith breached the Lease agreement when it failed to pay operating expenses from September 30, 2003, to June 2006, the MPA requested that the court enter a judgment against Gebhardt & Smith for $302,882.45, plus fees and interest.

In July 2006, Gebhardt & Smith vacated its leased office space in the WTC. The Lease expired on September 30, 2006,

and Gebhardt & Smith paid all base rent owed through the termination of the Lease.

On July 27, 2006, Gebhardt & Smith filed an amended complaint, adding a claim that the MPA engaged in "constructive fraud." It alleged that the MPA "owed a limited fiduciary duty to Gebhardt & Smith ... to account for the actual operating expenses ..." which it "failed to fulfill" "by asking for operating expenses it knew were not due." Gebhardt & Smith alleged that "Ernst & Young LLP falsified the operating expense calculation to assist and to aid and abet MPA in its efforts to defraud Gebhardt & Smith."

On October 10, 2006, Gebhardt & Smith filed a motion to dismiss its Declaratory Judgment Complaint on the ground that it involved the same issues as the counter-claim, *i.e.*, "MPA asserts that additional rent is due, and Gebhardt & Smith denies that any additional rent is owed." Gebhardt & Smith explained: "Because of the counter-claim, the case is fundamentally a collection case for an alleged breach of lease," and "MPA is the natural plaintiff and Gebhardt & Smith, the natural defendant." The court granted Gebhardt & Smith's motion and dismissed Gebhardt & Smith's complaint for a declaratory judgment.[9]

On April 23, 2007, MPA filed an amended counterclaim. Count I alleged that Gebhardt & Smith breached its contract with the MPA when it did not pay for "additional rent" under the Lease. Count II alleged that Gebhardt & Smith was unjustly enriched when Gebhardt & Smith received "the benefit of services for which other WTC tenants have paid," but it has refused "to pay the operating expense increase required under its lease[.]" MPA requested that the court enter judgment in its favor for $400,502.84, plus prejudgment interest at 12 percent per year, and a 17 percent fee "to cover all State collection and administrative costs."

---

9. At trial, Gebhardt & Smith was the defendant and the MPA was the plaintiff.

On May 7, 2007, Gebhardt & Smith filed a Motion to Dismiss or for Summary Judgment, arguing that the Lease is "void and unenforceable" because the MPA "may not, within the limitations of the Maryland Constitution and the Maryland Port Administration's governing statute, operate a commercial office building catering to and occupied predominantly by businesses that have nothing to do with maritime trade or activities." The court denied Gebhardt & Smith's motion.

On June 18, 2007, the MPA and the State of Maryland, Central Collection Unit ("CCU") filed a second amended counterclaim, which added CCU as an additional plaintiff. On June 27, 2007, Gebhardt & Smith responded and filed a Motion to Strike Second Amended Counterclaim, arguing that "delinquent accounts which are referred to the CCU for collection are subject to a 17% collection fee" and "it appears that the MPA's real motive for referring its claim against [Gebhardt & Smith] to the CCU is simply to artificially inflate the amount of its claim by 17%." The court granted Gebhardt & Smith's motion.

On February 25, 2008, the MPA filed a motion for summary judgment, raising three arguments why judgment should be entered in its favor. First, the MPA argued that, "[b]ecause G & S has identified no fraudulent or bad faith conduct by MPA in compiling the operating expenses for relevant fiscal years, G & S is bound by the 'final determination' of these expenses." Second, the MPA argued that it was entitled to summary judgment based on sovereign immunity. Third, the MPA argued that "G & S waived its right to rescind or avoid its obligations under the 1992 WTC Lease" when it continued to occupy the office space after receiving the documentation provided by the MPA regarding operating expenses. The circuit court denied this motion.

On February 26, 2008, Gebhardt & Smith moved for summary judgment, arguing that the contract was unenforceable because the MPA failed to satisfy a condition precedent in the contract, that an independent, certified public accountant cer-

tify the amount of operating expenses. The circuit court denied this motion.

On June 23, 2008, trial commenced. Michael Miller, Director of Maritime Commercial Management with the Maryland Port Authority, testified that the MPA is part of the Maryland Department of Transportation ("MDOT"), and the MPA operates the WTC on behalf of MDOT. He testified that there are costs associated with operating the World Trade Center, including basic management costs, utility costs, security, insurance, operating expenses, and leasing costs, and each tenant, pursuant to its lease agreement, pays its proportional share of operating expenses.

Joe Ford, the assistant comptroller with the Maryland Port Administration, testified that he was involved in the preparation of the operating expense schedules for MPA beginning in 2000. The MPA uses an electronic accounting system called Financial Management Information System ("FMIS") to track invoices and payments. Mr. Ford's office made the initial determination whether an invoice should be classified as an operating expense that would be billed and paid by the WTC's tenants. After Mr. Ford compiled the numbers and accumulated all the supporting documentation, the MDOT Office of Audits reviewed the information and made adjustments to the numbers, where necessary. For example, in 2001, they recommended adjustments of $128,000. When the audit by MDOT was complete, they sent the "formal audit report" to the outside auditor, who was either Ernst & Young or SB & Company, and also provided Mr. Ford with a copy of the report.[10] Once Ernst & Young or SB & Company completed its procedures, it provided Mr. Ford with a copy of the report that it created. When Mr. Ford received the report from Ernst & Young or SB & Company, the bill was sent to tenants for actual operating expenses.

---

**10.** Ernst & Young performed this review for fiscal years 2001 through 2004. SB & Company, as a subcontractor for another accounting firm, performed this review for fiscal years 2005 and 2006.

Mr. Ford testified that he understood the phrase "Lessor's certified public accountant," as used in Article 4(d) of the Lease, to refer to the work performed by Ernst & Young or SB & Company, not the Office of Audits. Mr. Ford is not a certified public accountant, but he has an "internal auditor certification."

Mark Gaspar, Administrative Partner with Gebhardt & Smith, testified that he was responsible for paying the rent for the office space rented by Gebhardt & Smith. Mr. Gaspar testified that, ordinarily, the operating expense bills were "fairly small," and he did not spend very much time reviewing the bill before it was paid. In 2002, Mr. Gaspar paid a bill for operating expenses for approximately $4,800 "[b]ecause it was a small amount" and "the letter represented to me that it had been ... audited and certified by an independent public accountant." Mr. Gaspar stated that, if the letter had not included this statement, he would have asked "for further information to make sure that they were not just calculated by [the WTC's building manager] or someone with the building." Upon receiving the bill for $56,000 in operating expenses in 2003, however, Mr. Gaspar took the bill to two other partners with Gebhardt & Smith. Gebhardt & Smith initially requested additional information from the WTC building manager, but it ultimately decided not to pay the bill because, after the reviewing the documentation provided by the WTC, it did not believe that the MPA had complied with the terms of the Lease.

James Smith, Managing Partner with Gebhardt & Smith, testified that Gebhardt & Smith leased office space in the WTC beginning in 1977. Following Hurricane Isabel, while Gebhardt & Smith was displaced from the WTC, Mr. Gaspar brought to his attention a bill for operating expenses. Mr. Smith characterized the increase from the prior year as a "very de minimus amount." Mr. Smith testified that he understood the phrase "Lessor's certified public accountant" to refer to "somebody independent" of the MPA and MDOT, and it was "of great importance to us that an independent

public account[ant] following audit standards verified [the operating expense] numbers."

Christine Carmon, Fiscal Accounts Manager with the MPA, testified that she prepared invoices for operating expenses for each tenant of the WTC. She testified that the letter that she sent to Gebhardt & Smith, indicating that WTC's operating expenses were "audited and certified by an independent public accountant," was a "form letter that was handed off" to her by her predecessor. She explained that, upon receiving "the report from the independent auditor," she would mail invoices for operating expenses to each tenant of the WTC. She testified, however, that the report from the accountants was not required by the Lease. She further testified that Gebhardt & Smith paid all of its base rent, but it had not paid its share of the operating expenses.

Joseph Lambdin,[11] Director of the Maryland Department of Transportation, Office of Audits, testified that he is a certified public accountant. He oversees the work of his office, which conducted audits on the WTC's operating expenses for fiscal years 2001–2006. Mr. Lambdin testified that he has managers that "do the first line supervision of the work," but he monitors the progress and signs the work. The Office of Audits employs three managers and six staff auditors; some of these auditors are certified public accountants.

Mr. Lambdin testified that, pursuant to government auditing standards, there was no independence issue with regard to his office performing audit procedures on the MPA. He testified that his office was free from any impairments, including personal, organizational, and external impairments.[12] He ex-

---

11. Mr. Lambdin's name is spelled in the record both as "Lamden" and "Lambdin." We will use "Lambdin" throughout this opinion because, based on a letter he signed that is part of the record, that appears to be the correct spelling.

12. Mr. Lambdin referred to government auditing standards. Section 3.16, The Comptroller General of the United States in Government Auditing Standards "Organizational Independence for Internal Audit Functions," provides:

plained that he reports directly to the head of the agency, the Secretary of the Department of Transportation, as one method used to allow the office to remain independent.

Mr. Lambdin testified that his office performed auditing procedures relating to the WTC's operating expenses. The procedure involved obtaining a schedule of operating expenses from the MPA for the World Trade Center," selecting a sample for each category of expense, and looking for documentation "to support the samples for the items that were selected in the sample." [13] Mr. Lambdin's staff reviewed the expenses to determine if they were bona fide, if they were reasonable, and if the expense related to ownership as opposed to operation of the facility.[14]

---

**3.16** Certain federal, state, or local government entities employ auditors to work for management of the audited entities. These auditors may be subject to administrative direction from persons involved in the entity management process.... Under [generally accepted government auditing standards], a government internal audit function can be presumed to be free from organizational impairments to independence for reporting internally if the head of the audit organization meets all of the following criteria:

a. is accountable to the head or deputy head of the government entity or to those charged with governance;

b. reports the audit results both to the head or deputy head of the government entity and to those charged with governance;

c. is located organizationally outside the staff or line-management function of the unit under audit;

d. has access to those charged with governance; and

e. is sufficiently removed from political pressures to conduct audits and report findings, opinions, and conclusions objectively without fear of political reprisal.

COMPTROLLER GENERAL OF THE UNITED STATES, GOVERNMENT AUDITING STANDARDS § 3.16 (2007).

13. Mr. Lambdin explained how they selected a sample. For example, with respect to utility bills, "lets say you have 12 bills ... one for each month, we might have looked at three ... or four. We look at a rather high percentage. [A] typical percentage in any population might be [ ] ten percent. We looked at—in some cases we looked at 100 percent because there might have been only one or two of the item[s]."

14. Mr. Lambdin subsequently clarified that, with respect to security and insurance, they relied on the expertise of the MPA regarding the reasonableness of the expense.

In 2001, after performing these procedures, the auditors from his office "determined that there were several expenditures not allowable in accordance with the standard lease agreement." These items included: (1) "$91,051 of capital renovations and administrative overhead expenses," which are specifically excluded in the lease as operating expenses; (2) "$42,904 for telephone costs that were not attributable to the operation and maintenance of the WTC"; (3) telephone costs of $16,690, which were allocated to WTC operation, but "could not be verified"; and (4) $25,000 "for 21st floor room rental admin assistant expenses," which "could not be verified." [15]

For fiscal year 2002, Mr. Lambdin's office again performed audit procedures on the WTC's operating expenses. It identified two errors in the initial calculations: (1) an error in the security expenses in the amount of $1,838; and (2) "[t]he calculation of liability insurance attributable to the operation of the WTC was overstated by $3,755."

Mr. Lambdin's office also audited the WTC's operating expenses for fiscal years 2003 through 2006. For each of these years, Mr. Lambdin sent a letter advising that the Office of Audits had "determined" that the MPA's operating expenses for those years were "adequately documented" and "allowable" in accordance with the standard lease agreement.

In addition to the audits performed by his office, which he identified as internal government auditors, Mr. Lambdin's office contracted with a private accounting firm to audit the WTC's operating expenses. For fiscal years 2001 through 2004, the contract was with Ernst & Young, and for fiscal years 2005 and 2006, the contract was with Abrams, Foster, Nole, & Williams, who subcontracted with SB & Company, LLC to perform this work.

The procedures that his staff performed were auditing procedures agreed upon with these two accounting firms. Mr.

---

**15.** The audit also discussed a "calculation error" in the "amount of fringe benefits reported by the [MDOT] police at the WTC[,]" which was "understated by $5,435."

Lambdin sent the accounting firms the reports of the audits his office performed. Mr. Lambdin testified to his belief that he was not "Lessor's certified public accountant," as identified in the Lease.

The MPA next presented the testimony of Lawrence Klumpp, a certified public accountant and a former manager in Ernst & Young's public sector group. Mr. Klumpp testified that he worked on the operating expense schedules for the WTC as part of the MDOT audit for most of fiscal years 2003, 2004 and 2005. Mr. Klumpp testified that independence is a key concept in auditing, and the independence requirement was satisfied when, pursuant to the applicable accounting standards, Ernst & Young had the MDOT Office of Audits perform an internal audit. The MDOT auditors followed established audit procedures that were for the purpose of documenting the allowable "operating expenses in accordance with the standard lease agreement."

Mr. Klumpp explained the procedures Ernst & Young performed after it received the report of the internal audit:

[Ernst & Young] reviewed the schedule of operating expenses prepared by the lessor, the MPA, in accordance with Article Four of the standard lease agreement in order to determine the amount of additional rent that may be due under the term of the lease. [Ernst & Young] reviewed Article Four of the standard lease agreement in order to determine that the charges that were to be included or excluded in the operating expenses.

Mr. Klumpp explained that if an expense did not fit with the Lease definition of operating expenses: "We would have brought it to the attention of management. We would have asked for clarification on those expenses and then determine[d] whether or not it met the criteria."

In response to the court's question regarding what happened when they noticed "this gigantic jump in operating expenses," Mr. Klumpp testified:

We actually performed within our procedures an analytical view to compare some of the costs. And we asked for

explanations of those. We actually tested on a sample basis some of those expenditures to make sure they were reasonable as per the lease agreement. As well as that they made—the explanations made sense.

So, for instance, if something increased why did it increase and what was the quantifiable and qualifiable reason for that increase so that we really understood it, because a lot of that is our own professional judgment and if we don't get the answers that make sense we continue to dig to get the correct answers.

Mr. Klumpp gave as an example expenses with respect to security. He testified that an increase in expenses was expected after the events of September 11, 2001. Mr. Klumpp subsequently testified, however, that Ernst & Young did not spend time to determine whether expenses that were incurred in the operation of the WTC were reasonable expenses pursuant to the requirement in the Lease.

Mr. Klumpp testified that Ernst & Young did not do a "stand alone audit" of the WTC expenses. Rather, it performed an audit "in relation to" the MDOT financial statements. Mr. Klumpp explained that the procedures were not different for an "in relation to" audit, but the standards for materiality would be different. Materiality, he explained, is a "calculation that we do in determining whether a number . . . is materially incorrect," which for MDOT "is around $2 million," but for the WTC would be "about $30,000 to $40,000." He further testified that, given MDOT's "very large balance sheet," materiality would be different in an "in relation to" audit as opposed to a "stand alone" audit. He testified that the schedule of operating expenses for the WTC, as part of MDOT's total consolidated financial statements, "is actually immaterial."

Monique Booker, a certified public accountant with SB & Company, testified that, in 2005 and 2006, her accounting firm contracted with Abrams, Foster, Nole, & Williams to "perform the procedures" and determine whether the operating expenses that were provided to her firm "were in accordance

with the lease." She explained that an audit does not encompass a review of 100 percent of the material provided. Rather, "[y]ou determine the materiality threshold and you perform testing in order to issue an opinion that those statements are not materially misstated, which would not cover 100 percent of any sample, in order to issue that opinion."

The MDOT internal auditors selected a sample of the operating expenses compiled by the MPA, they reviewed the invoices and documentation, and they verified the propriety of the expenses. They advised SB & Company that they had "determined" that the WTC operating expenses were "adequately documented and allowable in accordance with the standard lease agreement." Ms. Booker testified that it was her understanding that the MDOT auditors were not engaged to perform a full audit of the operating expenses for the WTC in accordance with generally accepted government auditing standards.

After her firm was provided the operating expenses for the WTC, she looked "at the supporting documentation for that expenditure," to verify that the expenditure related to the description. Her firm then "determined that the expenses that were provided to us were in accordance with the World Trade Center lease." She testified that they looked to whether the expenses were included as operating expenses pursuant to the lease and they verified that the expenses were supported by proper documentation, but they did not determine whether an invoice was for a reasonable amount. For example, she testified that, with respect to insurance, "[w]e confirmed that it was insurance and that there was proper invoice support that that was the amount of the insurance incurred" by the MPA, but her firm did not determine whether the MPA's $150,000,000 liability policy on the WTC was a reasonable amount for an office building.[16]

---

16. The deposition of Stephen Baloga, an Ernst & Young auditor, was introduced into evidence. He stated that a determination regarding the reasonableness of an insurance expense is "typically not encompassed in a normal financial compliance audit."

Brent Solomon, a certified public accountant with the Resnick Group, a certified public accounting and consulting firm, testified on behalf of MPA as an expert witness in "commercial leases and accounting." He testified that it is typical in a commercial lease for the tenant to share increases in operating expenses. Operating expenses "[t]ypically included ... any expense required to run the building," including utilities, maintenance, security, cleaning, and insurance.

Mr. Solomon testified regarding the Lease provision that "operating expenses" "shall be as determined by Lessor's certified public accountant." He testified that "if the intent is to require an independent audit," "it is typical to be more clear to say independent." He testified that the language in this Lease did not require an audit of the schedule of operating expenses, and the reference to a "certified public accountant" described "a person holding a license."

Mr. Solomon testified that the procedures for review of the operating expenses in this case, with internal accounting, internal auditors, and external auditors, were "extensive." He explained:

> [T]here's no rule in accounting that says that you have to have internal auditors involved or you have to have external auditors involved. In my experience, I see it all across the board. I work with many properties where there are no internal or external audits. Statements are just provided to tenants. And I've worked with clients that have external audits of their statement of operating expenses.
>
> So I think the two—the two levels of independent audit, if you will, in my mind are fairly extensive based on my experience.

When asked by the court whether the internal audit alone would have been sufficient to satisfy the requirements of the Lease, Mr. Solomon answered in the affirmative, stating that "the [MDOT] internal auditors would qualify as the lessor's certified public accountant."

On cross-examination, Mr. Solomon characterized Ernst & Young's report as a "supplemental opinion." He testified that

"[n]o completely independent certified public accountant ever issued a stand alone statement [of operating expenses]." He testified, however, that there was no requirement in the Lease for such an audit.

The MPA called several witnesses to testify regarding the reasonableness of the operating expenses charged. Witnesses testified, among other things, regarding the basis for, and the reasonableness of, liability insurance carried by the WTC and the security at the WTC.

Gebhardt & Smith called three expert witnesses. Paul White, a consultant on property management, testified as an expert in commercial office building management. Mr. White testified that the Lease provision for a determination of operating expenses by "Lessor's certified public accountant" implied that a third party, an independent accountant, would review the operating expenses. He agreed that, if that is the intent, it should say "independent," but he testified that "this is a lease out of the 70s, and they were ambiguous." He agreed that an audit by a certified public accountant would satisfy the Lease "[a]s specifically written," but "it would not be the spirit of the agreement." He further agreed that "an outside auditor like Ernst [&] Young would satisfy the requirement," "[i]f they did a complete audit." Mr. White testified that an audit conducted by the MPA or MDOT would not satisfy the Lease because they are not independent, they are "under the control and guidance of their bosses and their superiors." He admitted, however, that he is not an accountant, and he did not know whether "generally accepted government accounting standards would consider" an audit by MDOT auditors of the MPA to be independent.

Mr. White also testified that certain costs billed to Gebhardt & Smith were included improperly as operating expenses under the lease, including costs related to security, janitorial services, and administration. Mr. White testified that tenants sometimes negotiate a limit, "in terms of dollar amount or percentage increase," on operating expenses, but no such limit was included in this Lease.

Paul Amoruso, an insurance consultant, testified as an expert in commercial insurance. Mr. Amoruso testified that the $150,000,000 liability policy on the WTC was an excessive amount of insurance, which he characterized as "highly unusual." He also opined that MPA's method of determining the proper level of insurance on the building, *i.e.*, a method based on revenue projection, bore no "relationship to the exposure produced by this particular building." With respect to the amount of casualty insurance on the building, he similarly testified that the "amount of the insurance on the building was extremely high."

Andrew Lombardo, a certified public accountant with Sturn, Wagner, Lombardo & Company, LLC, testified as an expert in financial accounting. He testified that the Lease required that "outside accountants determine the expenses of the World Trade Center," which can be done in one of two ways: "They can do the bookkeeping or they can audit somebody else[']s bookkeeping, and neither was done." With respect to the determination of operating expenses, he testified that Mr. Ford, and not a certified public accountant, determined Gebhardt & Smith's operating expenses. Mr. Lombardo testified that, although not unusual for a person such as Mr. Ford to initially compile the data, "for it to be deemed to be determined by a CPA, the CPA would have to audit it themselves." Mr. Lombardo testified that the MDOT auditors did not consult "outside expertise," and they "simply accepted the charge from the State and verified that thats [sic] what the State ... allocated to the Port Authority."

Mr. Lombardo distinguished an audit, which he contends was never performed, and the procedures that the private firms performed here:

An audit is a comprehensive approach that includes the study, analysis of internal control. It includes a study and consideration of fraud being a possible audit risk. It includes outside confirmation of certain items that would verify the expenses that, the items that they found within the books of the World Trade Center. It includes consultation with experts in areas that the auditors are not expert to

determine the reasonableness and bona fide-ness of certain expenses. It includes confirmation with the entities['] attorney to determine that there are no other expenses or contingencies that must be considered and included and accrued into that or should the attorney advise them of such matters.

And I could go on. It[']s a very comprehensive approach to that body of procedures that must be done in order for us to render an audit opinion ... it[']s the highest level of assurance that we as professionals can give the users of that report or any set of financial statements. What they did was selected procedures that were determined by the Maryland Department of Transportation, not by Ernst & Young or SB & Company or anyone else.

Mr. Lombardo further explained how, in his opinion, the work of the two accounting firms was deficient:

They should have, on their own, planned the work. They should have, on their own, independent from the employees of the entity to which the procedures were performed, they should have determined what should have been, the scope of the work that had to be done to sign their name to that report. They should have [ ] had their own employees supervise and test and re-perform the work done by the internal auditors to make sure that what they said they did on their work papers they actually did.

And the way you do that is the report signing auditor, when they take responsibility for somebody else[']s work, ask to retest their work to make sure that they say this invoice agreed to this record in the books. They have to put their own eyes on that and make sure that that[']s, what they said they did, they did. And I do not see them having done any of that in the work given to me with regard to this case.

Moreover, he testified that based on the size of the World Trade Center in relation to the size of the Maryland Port Administration, and more importantly the size of the Department of Transportation, that the World Trade Center

expenses are so insignificant to the overall expenses and accounts of those entities that, in my opinion, most probably [ ] never fell under . . . scrutiny of an auditor because of its relative insignificance to the overall entity that was, in fact, audited.

Mr. Lombardo further testified that several expenses were charged improperly to Gebhardt & Smith. He specified certain invoices, some administrative costs, and charges for operating expenses while the WTC was closed following Hurricane Isabel.

The parties also submitted depositions of three certified public accountants employed by Ernst & Young. Mr. Stephen Baloga stated in his deposition that Ernst & Young was the auditor for MDOT for fiscal years 2001 through 2004. He explained the in-relation-to reports that they prepared regarding the operating expenses of the WTC. Mr. Baloga stated that, under government auditing standards, the MDOT auditors could qualify as independent auditors. He stated that Ernst & Young did not do an audit of the operating expenses. They did an audit of MDOT and then "issued an in-relation-to report relative to the schedule of operating expenses."

On July 15, 2008, the court issued an order entering judgment in favor of the MPA for $328,186.88, plus interest. In its written opinion, the court rejected Gebhardt & Smith's argument that the Lease imposed a requirement on MPA to have its operating expenses audited by an *independent* certified public accountant:

G & S maintains that as a condition precedent, MPA was required to have an independent certified public accountant determine the actual operating expenses at year's end. The lease does not refer to an *independent* certified public accountant. It required Lessor's certified public accountant to determine the operating expenses. The confusion may have been caused by MPA's annual form letter which stated that the expenses were "audited and certified by an independent public accountant."

The lease is unambiguous and the plain meaning of written words in an unambiguous lease govern the rights and obligations of the parties, not the subjective intention of one of the parties. The lease is read to have the meaning that a reasonable person in the position of the parties would understand it to have. *Walton v. Mariner Health of Md. Inc.*[,] 391 Md. 643, 660, 894 A.2d 584, 594 (2006). While Joe Ford, assistant controller [sic] for MPA, is not a certified public accountant, Joseph Lambdin, the head of the MDOT audit team, is a certified public accountant. Certified public accountants are held to professional ethical and work standards by the very nature of their training and certification. This Court found Mr. Lambdin's testimony credible. He explained that the audits performed by his office were consistent with government auditing standards and performed by certified public accountants. According to the testimony, the MDOT Office of Audits obtained a schedule of operating expenses from the MPA, selected a statistically valid random sample of entries, and verified that those entries were allowable in accordance with the lease agreement. The MDOT Office of Audits reported the results of its audit procedure to MPA, and recommended adjustments to various expense categories. This Court finds that this was a determination of the operating expenses by a certified public accountant as required by the lease.

(Footnote omitted).

With respect to the argument that the outside certified public accountant satisfied the terms of the Lease, the court stated:

This Court does have concerns about MPA's argument that the function performed by the independent certified public accountants was an audit of WTC's operating expenses. The independent certified public accountants were hired to perform an audit of the WTC expenses "in relation to" the MDOT audit. While the experts disagreed about whether an "in relation to" audit was proper in this situation, everyone agreed that the audit of the WTC could not

stand alone and must be viewed in relationship to the MDOT data. This Court agrees with G & S' financial expert that while an audit does not require a check of each entry, an auditor must evaluate the numbers in relation to the other numbers provided to determine if they are reasonable. Because the MDOT audit involved values close to $100 million dollars and the WTC only involved values of $3 million dollars, the WTC numbers would not be statistically significant at all in an audit of the entire MDOT. Without the MDOT audit attached, the WTC numbers would have been difficult to understand.

While this Court agrees that the determinations made by [Ernst & Young] and [SB & Company] did not comply with the terms of the lease, the audit by MDOT auditors of the operating expenses did comply.

Finally, the court addressed the argument that, pursuant to the terms of the Lease, which indicated that the certified public accountant's calculations were "final," Gebhardt & Smith was precluded from challenging whether the operating expenses were calculated correctly. The court stated:

Further, because the lease specifies that any determination made by the Lessor's certified public accountant ("CPA") is final, there is no need for this Court to examine whether the operating expenses were calculated correctly. The calculations of the CPA are presumed to be correct.

This timely appeal followed.

## STANDARD OF REVIEW

In a case tried without a jury, "the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). "Under the clearly erroneous standard, 'we must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether

they were supported by a preponderance of the evidence.'" *Royal Inv. Group, LLC v. Wang,* 183 Md.App. 406, 430, 961 A.2d 665 (2008) (citations omitted). "When the trial court's [decision] 'involves an interpretation and application of Maryland statutory and case law, [the appellate court] must determine whether the lower court's conclusions are legally correct....'" *Hillsmere Shores Improvement Ass'n v. Singleton,* 182 Md.App. 667, 690, 959 A.2d 130 (2008) (citation omitted). "We make this determination *de novo,* without deference to the legal conclusions of the lower court." *Id.*

## DISCUSSION

Gebhardt & Smith contends that the trial court erred in finding that it breached the Lease with respect to its obligation to pay its share of the operating expenses of the WTC. It asserts two grounds of error.

First, Gebhardt & Smith argues that there was a condition precedent to its obligation to pay for operating expenses, that the operating expenses be determined by an outside, independent, certified public accountant. Gebhardt & Smith argues that the MPA "did not satisfy this condition precedent," and therefore, it was not entitled to collect operating expenses from Gebhardt & Smith. It contends that the circuit court erred in finding that the contract did not require that an independent certified public accountant determine the expenses, and that the internal audit by MDOT satisfied the requirement in the Lease.

Second, Gebhardt & Smith argues that the trial court erred in its interpretation of the provision in the Lease that the determination of operating expenses by the certified public accountant was "final." The circuit court found that, pursuant to this language, the certified public accountant's determination could not be contested. Gebhardt & Smith disputes this interpretation of the Lease, arguing that the Lease did not unequivocally state that the determination could not be contested, and that even if the Lease is so construed, it could be challenged for bad faith or fraud.

The MPA contends that the circuit court properly concluded that Gebhardt & Smith breached the Lease. It argues that the determination of expenses by a certified public accountant was not a condition precedent to Gebhardt & Smith's obligation to pay operating expenses. Even if it was a condition precedent, the Lease did not require that MPA's certified public accountant be "independent," and the circuit court properly found that the work of MDOT's internal auditors constituted a determination of the operating expenses as required by the Lease. The MPA further notes that, although not relied upon by the circuit court, private accounting firms verified the MDOT auditor's determination of the operating expenses to meet the "reporting requirements of the World Trade Center standard lease agreement." Finally, the MPA argues that the circuit court properly concluded that Gebhardt & Smith did not have the right to dispute the statement of operating expenses it provided because the Lease stated that the statement of expenses "shall constitute a *final determination* as between Lessor and Lessee."

"The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court." *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250, 768 A.2d 620 (2001). "Maryland adheres to the principle of the objective interpretation of contracts." *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700 (2007). " 'If a contract is unambiguous, the court must give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation.' " *All State Home Mort., Inc. v. Daniel,* 187 Md.App. 166, 181, 977 A.2d 438 (2009) (quoting *Nova Research, Inc. v. Penske Truck Leasing Co., L.P.,* 405 Md. 435, 448, 952 A.2d 275 (2008)). As this Court has stated:

A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. Put another way, "the clear and unambiguous language of an agreement will not give away

to what the parties thought that the agreement meant or intended it to mean."

*Phoenix Servs. L.P. v. Johns Hopkins Hosp.*, 167 Md.App. 327, 392, 892 A.2d 1185 (2006), *cert. denied,* 393 Md. 244, 900 A.2d 750 (2006) (citations omitted). Moreover, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358 (1999) (quoting *Canaras v. Lift Truck Services*, 272 Md. 337, 350, 322 A.2d 866 (1974)).

## I.

Gebhardt & Smith first contends that it does not owe the MPA any money for operating expenses because the Lease created a condition precedent to its obligation to pay, and the MPA failed to satisfy that condition. Specifically, Gebhardt & Smith argues: (1) language in the Lease providing that the operating expenses "shall be as determined by Lessor's certified public accountant" constituted a condition precedent; (2) the condition precedent was that the expenses be "determined" by an "outside, independent certified public accountant"; (3) the MPA failed to fulfill this requirement; and (4) this failure excused Gebhardt & Smith's contractual obligation to pay increases in operating expenses from 2002 to 2006.

The MPA disagrees, for two reasons. First, it argues that "[t]he Lease did not condition G & S's duty to pay for operating expense increases on the 'determination' of the statements of actual operating expenses by MPA's certified public accountants." It argues that the Lease did not include language commonly used to indicate a condition precedent, *i.e.,* it did not provide that Gebhardt & Smith had to pay operating expenses "if and only if" or "provided that" MPA's certified public accountant determined the operating expenses. Rather, the MPA argues that "[t]he Lease unqualifiedly and without condition required G & S to pay for operating expense increases." Second, the MPA argues that, even if the Lease

contained a condition precedent, the MPA complied with the Lease when the MDOT Office of Audits determined that operating expenses compiled by MPA "were allowable in accordance with" the Lease.

"A condition precedent in a contract is 'a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises.'" *All State Home Mort.,* 187 Md.App. at 182, 977 A.2d 438 (quoting *Chirichella v. Erwin,* 270 Md. 178, 182, 310 A.2d 555 (1973)).

"The question whether a stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation.... Although no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that,' are commonly used to indicate that performance has expressly been made conditional, as have the words 'when,' 'after,' 'as soon as,' or 'subject to....'"

*Aronson & Co. v. Fetridge,* 181 Md.App. 650, 682, 957 A.2d 125 (2008) (quoting *Chirichella,* 270 Md. at 182, 310 A.2d 555).

Gebhardt & Smith is correct that, "'[g]enerally, when a condition precedent is unsatisfied, the corresponding contractual duty of the party whose performance was conditioned on it does not arise.'" *Chesapeake Bank v. Monro Muffler/Brake, Inc.,* 166 Md.App. 695, 708, 891 A.2d 384 (2006)(quoting *B & P Enters. v. Overland Equip. Co.,* 133 Md.App. 583, 606–607, 758 A.2d 1026 (2000)), *cert. denied,* 392 Md. 726, 898 A.2d 1005 (2006). As the MPA points out, however, because of "the potentially severe implications of the imposition of a condition precedent, courts have been careful to distinguish a condition precedent from a covenant, which ordinarily requires only substantial compliance." *B & P Enters.,* 133 Md.App. at 607, 758 A.2d 1026.

Several cases are instructive in determining whether there was a condition precedent in the Lease. In *Laurel Race*

*Course, Inc. v. Regal Construction Co., Inc.,* 274 Md. 142, 150, 333 A.2d 319 (1975), the parties contracted to rebuild a race track. The Court of Appeals set forth the general rule that, "where payments under a contract are due only when the certificate of an architect or engineer is issued, production of the certificate becomes a condition precedent to liability of the owner for materials and labor in the absence of fraud or bad faith...." *Id.* In that case, the contract provided that *"when [the Engineer] finds the work acceptable ... and the Contract fully performed,* he shall promptly issue a 'Final Certificate,' " and "[t]he balance due the Contractor, *will then be paid ....*" *Id.* at 151 n. 2, 333 A.2d 319. The Court of Appeals found that there was "no question but that" payment was "expressly conditioned upon production of the engineer's 'Final Certificate.' " *Id.* at 151, 333 A.2d 319. Indeed, in that case, the contract contained one of the words typically used to indicate a condition precedent, *i.e.,* payment was to be made *when* the certificate was issued.

*James Julian, Inc. v. State Hwy. Admin.,* 63 Md.App. 74, 492 A.2d 308 (1985), is similarly instructive. That case involved a contract for the construction of a road. *Id.* at 76, 492 A.2d 308. The contractor sued the Mayor and City Council of Baltimore and the State Highway Administration for breach of contract, arguing that they failed to pay for work completed. *Id.* at 76–79, 492 A.2d 308. In denying relief, this Court noted the clear language in the contract that certain procedures be followed as "a condition precedent to the right of the Contractor to recover...." *Id.* at 81, 492 A.2d 308. Because the dispute had not been resolved pursuant to the procedures set forth in the contract, and because the contract clearly set forth that following these procedures was a condition precedent to recovery, this Court upheld the trial court's holding that Julian failed to exhaust its contractual remedies. *Id.*

Here, as indicated, the contract provided as follows:

The Statements of the real estate taxes and operating expenses to be furnished by Lessor as provided in subdivisions (b) [referring to Real Estate Taxes] **and (c)** [referring to operating expenses] above **shall be as determined by**

Lessor's certified public accountant.
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx. The
statements thus furnished to Lessee **shall constitute a
final determination** as between Lessor and Lessee of the
real estate taxes and operating expenses for the periods
represented thereby.

(Emphasis added).

 This Lease provision does not contain clear language
providing that a determination of the operating expenses by
"Lessor's certified public accountant" is a condition precedent
to Gebhardt & Smith's obligation to pay these expenses. Nor
does the contract include language typically used to create a
condition precedent. It does not state that Gebhardt & Smith
is obligated to pay operating expenses "if," "when," "after," or
"provided that" "Lessor's certified public accountant" deter-
mines the operating expenses. As such, it does not create a
condition precedent to Gebhardt & Smith's obligation to pay
such expenses.

 Even if we were to agree, however, that the Lease
contained a condition precedent that the statements of operat-
ing expenses be "as determined" by "Lessor's certified public
accountant," Gebhardt & Smith would not prevail. As ex-
plained below, we agree with the circuit court that the MPA
complied with this provision of the Lease based on the audit
procedures performed by the MDOT Office of Audits.

Gebhardt & Smith raises several arguments in support of
its contention that the procedures performed by the MDOT
Office of Audits did not satisfy the Lease requirements. Ini-
tially, it argues that the term "Lessor's certified public ac-
countant" referred to an outside, independent certified public
accountant, and that the MDOT Office of Auditors did not
satisfy that requirement. Moreover, it argues that the MDOT
auditors did not "determine" the operating expenses. Finally,
it asserts that the circuit court erroneously relied on Mr.
Lambdin's designation as a certified public accountant, argu-
ing that "he did virtually no work on the operating expenses."

We begin with Gebhardt & Smith's contention that the contract required that the MPA use an outside, independent, certified public accountant to determine the operating expenses. Gebhardt & Smith acknowledge that the words "outside" and "independent" are not contained in the contract next to the term "certified public accountant." It argues, however, that the terms are "reasonably implied to be part of the phrase."

In support of its argument, Gebhardt & Smith cites WILLISTON ON CONTRACTS:

> It should be noted that terms are to be implied in contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship, such that parties must have intended them and must have failed to express them only because of sheer inadvertence or because they are too obvious to need expression.

§ 31:7, at 321 (4th ed.2000). Gebhardt & Smith argues that "the failure to insert 'outside' or 'independent' next to certified public accountant in the Lease can only be ascribed to sheer inadvertence or obviousness."

Initially, we note that in the circuit court, Gebhardt & Smith confined its argument to the word "independent" as an implied term. Although it argued that the MDOT auditors were not independent because they were not "outside" "the MPA sphere," counsel did not argue that "outside" was an implied part of the phrase "certified public accountant." Accordingly, the only argument that is preserved for this Court's review is whether the term "independent" should be read as an implied term into the contract. *See Robinson v. State,* 404 Md. 208, 216, 946 A.2d 456 (2008) (appellate court ordinarily will not consider issue "unless it plainly appears by the record to have been raised in or decided by the trial court") (quoting Maryland Rule 8–131(a)).

The trial court rejected the argument that the Lease required that the certified public accountant be "independent," noting that the Lease referred to "Lessor's certified public accountant," but it did not contain the word independent. The

evidence supported the trial court's finding. Two experts at trial, Brent Solomon and Paul White, Gebhardt & Smith's own expert, testified that if the intent is for a certified public accountant to be independent, the contract should say "independent." We agree that, if the parties to a contract intend that a certified public accountant specified in the contract be "independent," the contract would specifically state that requirement.

Even if the word "independent" could be read as an implied word in the term certified public accountant, however, we believe that condition was satisfied here. Joseph Lambdin, whose testimony the trial court found credible, testified that the MDOT Office of Audits was independent. His testimony is supported by government auditing standards, which provide that a "government internal audit function" can be independent. COMPTROLLER GENERAL OF THE UNITED STATES, GOVERNMENT AUDITING STANDARDS § 3.16 (2007). Moreover, as the trial court stated: "Certified public accountants are held to professional ethical and work standards by the very nature of their training and certification."[17] Accordingly, even if the term "independent" is an implied term, the MDOT Office of Audits satisfied that condition. Gebhardt & Smith cites no case holding to the contrary.

Gebhardt & Smith's next contention, in support of its claim that the MDOT auditors did not satisfy the requirement that operating expenses be "determined" by "Lessor's certified public accountant," is that Mr. Lambdin and the other auditors did not "determine" the operating expenses. We are not persuaded.

■■■ Mr. Lambdin testified that the Office of Audits followed agreed upon procedures in auditing the WTC's operating expenses for fiscal years 2001 through 2006. This involved obtaining the schedule of operating expenses from the MPA,

---

17. The Code of Professional Conduct for certified public accountants in Maryland requires that "[a] licensee who is performing an engagement in which the licensee is to issue a written certificate or opinion ... shall be independent with respect to the client in fact and appearance." Code of Maryland Regulations ("COMAR") 09.24.01.06.A.1.

selecting a sample of the expenditures, and reviewing documentation to determine whether it supported the expenditures. After these procedures were completed, Mr. Lambdin sent a report to the outside certified public accountants, stating that his office had "determined" that the expenses listed were allowable pursuant to the Lease. We agree with the trial court's assessment that the MDOT auditors "determined" the operating expenses pursuant to the Lease. *See* WEBSTER'S NINTH COLLEGIATE DICTIONARY 346 (1987) (defining "determine" as, among other things, to "come to a decision about by investigation, reasoning or calculation").

Gebhardt & Smith asserts that the "MDOT auditors blindly accepted MPA's judgmental decisions as being correct." That contention is belied by the record. As set forth, *supra*, on several occasions after performing its audit procedures on the figures compiled by MPA, the MDOT auditors "determined" that some expenditures were "not allowable" pursuant to the Lease. MDOT did not blindly accept MPA's decisions regarding allowable operating expenses.

Gebhardt & Smith further argues that Mr. Lambdin testified that the MDOT auditors did not "determine" the operating expenses and that this testimony should be binding on the MPA. The transcript reflects, however, that although Mr. Lambdin testified at his deposition that his office did "not determine, we audit," he clarified at trial that, when he said this at his deposition, he was confused.

Gebhardt & Smith next contends that MDOT's audit did not qualify as a determination by "Lessor's certified public accountant" because some of the MDOT auditors were not certified public accountants and, although Mr. Lambdin was a certified public accountant, he did "virtually no work" on the auditing procedures. Mr. Lambdin testified, however, that he oversaw all the audits performed by his office, and he signed for the work. The trial court properly relied on Mr. Lambdin's designation as a certified public accountant to find compliance with the Lease provision.

We find no error in the circuit court's conclusion that the agreed-upon procedures performed by MDOT's Office of Au-

dits regarding the WTC's operating expenses complied with the Lease requirement that the operating expenses be determined by "Lessor's certified public accountant." Thus, we will proceed to address the trial court's ruling that the expenses "as determined" were "final" and could not be challenged in court.

Before moving to that issue, however, we address one additional argument. Gebhardt & Smith contends that, with respect to fiscal year 2007, "no one ... determined the actual operating expenses from July 1, 2006 to September 30, 2006." It states that, despite "the absence of any evidence, [the circuit court] awarded MPA the full amount it demanded for the stub period." This two sentence portion of the brief contains no caselaw, no citations to the record, and it fails to even assert the amount of money it claims was improperly awarded to the MPA. The MPA does not respond to this contention.

At trial, the circuit court asked about the expenses for fiscal year 2007, and the MPA responded that the invoices for the estimated operating expenses, in the amount of $28,557.00 were introduced into evidence. Gebhardt & Smith does not dispute that the Lease required them to pay the estimated operating expenses, and it has not set forth any specific argument regarding what it contends was improper with respect to these particular expenses.[18] As such, we will not disturb the circuit court's finding that the failure to pay these expenses was a breach of the Lease.

## II.

### Final Determination of Operating Expenses

Gebhardt & Smith next contends that, even if the MPA satisfied the condition precedent to Gebhardt & Smith's obligation to pay operating expenses, "[t]he MPA/MDOT determi-

---

18. Because the estimated operating expenses did not qualify as the statement of expenses constituting a "final determination" of the expenses, *see infra,* they presumably could be challenged in court.

nations of operating expenses were replete with error and included expenses not authorized by the Lease[.]" [19] It argues that the circuit court erred in finding that the MPA's determination of the operating expenses could not be challenged in light of the Lease provision that the statement of operating expenses "furnished to Lessee shall constitute a **final determination** as between Lessor and Lessee of the . . . operating expenses for the periods represented thereby." (Emphasis added).

The trial court relied upon this language in the contract in ruling that, "because the lease specifies that any determination made by the Lessor's certified public accountant ('CPA') is final, there is no need for this Court to examine whether the operating expenses were calculated correctly. The calculations of the CPA are presumed to be correct."

Gebhardt & Smith contends that the court erred in finding that "the presumption of correctness was irrebutable and could not be contested or challenged." It argues that the Lease did not unequivocally state that the determination could not be contested, and that, even if the Lease is so construed, it could be challenged for bad faith or fraud.

The MPA counters that "[t]he circuit court correctly concluded that the Lease did not grant G & S the right to dispute the statement of operating expenses furnished by MPA." It argues that, because the contract states that the operating expenses constituted a "final determination," the Lease "explicitly and unequivocally conveyed the parties intent to be bound by the operating expense statements furnished by MPA."

---

19. Gebhardt & Smith cites as "some (but not all) examples of improper procedures and expenses": (1) security; (2) self-insured casualty and rent interruption insurance; (3) excessive and misapportioned liability insurance; (4) capital repairs as maintenance; (5) administrative overhead and management expense; (6) repairs; (7) leasing expenses; (8) failure to use the accounting method called for in the Lease; (9) the MPA billed Gebhardt & Smith for operating expenses during the time period which the building was closed; and (10) Gebhardt & Smith was never provided with a statement of actual operating expenses for fiscal year 2007.

 "[O]rdinarily, parties to a contract are entitled to turn to the courts to resolve disputes arising from a contract." *Phoenix Servs. L.P.*, 167 Md.App. at 396, 892 A.2d 1185. It is clear, however, that parties to a contract can waive that right and provide that a designated person has "authority to render a final and binding decision." *Id.* at 403, 892 A.2d 1185. As Judge Hollander stated for this Court in *Phoenix*, however, that intent must be expressed clearly:

> [I]n order for a contract to foreclose or waive the important right of a party to challenge or litigate the conclusions of a third party, the parties to the contract must clearly and expressly agree that the third party's determination is final, binding, and conclusive. Put another way, they must use unequivocal language that unmistakably evidences the parties' intent because "the contract must leave no doubt that this was intended."

*Id.* at 396, 892 A.2d 1185 (citations omitted).

 When a contract designates a third party, or one of the parties, to make a binding decision, that decision is subject to judicial review only in limited circumstances. As the Court of Appeals explained in *Baltimore v. Allied Contractors*, 236 Md. 534, 545, 204 A.2d 546 (1964):

> It is established that when the parties have provided for a binding determination of disputed matters by a designated person, such as an architect or engineer, even though that person is an official or representative of one of the parties, his decision . . . is final and conclusive on both parties in the absence of fraud or mistake so gross as to imply bad faith or the failure to exercise honest judgment.

(Emphasis omitted). *Accord Charles Burton Builders, Inc. v. L & S Constr. Co., Inc.*, 260 Md. 66, 84, 271 A.2d 534 (1970) (when the parties agree to "refer any question of performance to the decision of one of them or to a third party, the decision of such a party is final in the absence of fraud or bad faith.").[20]

---

**20.** These cases, providing that the parties can provide for a binding determination by "one of them," *Charles Burton Builders, Inc. v. L & S*

In *Phoenix*, 167 Md.App. at 344, 892 A.2d 1185, the parties contracted for Phoenix to dispose of Johns Hopkins Hospital's medical and non-medical waste. The contract included a provision permitting the hospital to terminate the contract for cause under specified circumstances. *Id.* at 340, 892 A.2d 1185. Specifically, it provided that the hospital could terminate the contract without penalty if, after a failure to perform, Phoenix failed to provide a certificate of an Independent Engineer that Phoenix had made changes sufficient to prevent the reoccurrence of the problem. *Id.* at 341–42, 892 A.2d 1185.

Problems subsequently ensued, and the hospital sent a notice of suspension to Phoenix. *Id.* at 347–48, 892 A.2d 1185. Pursuant to the terms of the contract, in order to lift the suspension and prevent termination of the contract, Phoenix had "thirty days to provide a Certificate of Reasonable Assurance from the Independent Engineer." *Id.* at 348, 892 A.2d 1185. The engineer provided a certificate, but the hospital rejected the certificate and terminated the contract. *Id.* at 351–52, 892 A.2d 1185.

The question on appeal was whether the hospital could challenge the certificate or whether, pursuant to the contract, the Independent Engineer's judgment was final. *Id.* at 371, 892 A.2d 1185. Noting that the contract did not contain language indicating that the decision by the engineer was "binding" or "final and conclusive," this Court held that the determination of the engineer "was subject to challenge through the judicial process." *Id.* at 402–403, 892 A.2d 1185.

Gebhardt & Smith acknowledges that the court's decision in *Phoenix* does "not require an incantation of three synonyms [final, binding, and conclusive] in a contract before a determination or approval of a designated person could be made

---

*Constr. Co.*, 260 Md. 66, 84, 271 A.2d 534 (1970), or a person that is "an official or representative of one of the parties," *Baltimore v. Allied Contractors*, 236 Md. 534, 545, 204 A.2d 546 (1964), disposes of Gebhardt & Smith's contention that a "determination, to be incontestable, must be made by a third party."

incontestible." Rather, it requires only the use of "unequivocal language that unmistakably evidences" that intent.

Here, the Lease provided that the statements of operating expenses "as determined by Lessor's certified public accountant" "shall constitute **a final** determination as between Lessor and Lessee." (Emphasis added). This provision satisfied the requirement of a clear intent to waive the right to challenge the determination of the certified public accountant.

To be sure, many of the cases cited in *Phoenix Services,* 167 Md.App. at 398–402, 892 A.2d 1185, involved contracts providing that the decision of the designated person was "final and conclusive" or "final and binding." *See, e.g., Laurel Race Course,* 274 Md. at 151–52 n. 3, 333 A.2d 319 (decision of engineer shall be "final and binding"); *Allied Contractors,* 236 Md. at 538, 204 A.2d 546 (director's decision shall be "final and conclusive"). The parties have not cited any case, however, that stands for the proposition that a contract providing for a "final" decision on a disputed issue is not a conclusive decision on the parties. The definition of the word final indicates that it means conclusive. *See* WEBSTER'S NEW THIRD INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 851 (2002) (defining "final" as "not to be altered or undone"); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 463 (1987) (defining "final" as "not to be altered or undone; of or relating to a concluding court action or proceeding . . . of or relating to the ultimate purpose or result of a process.").

Significantly, in *Phoenix,* 167 Md.App. at 392, 892 A.2d 1185, in determining that there was no language in the portion of the contract addressing the Independent Engineer that suggested that the Engineer's decision was not subject to judicial challenge, this Court looked at another provision in the contract. The contract provided that disputes should be decided by arbitration, and the "award rendered by the arbitrator(s) shall be final. . . ." *Id.* at 336, 402, 892 A.2d 1185. Although not a holding in the case, this Court characterized that provision as providing that the arbitration award was binding. *Id.* at 402, 892 A.2d 1185.

Other cases support that interpretation. In *Wayne v. Chopivsky*, 657 F.Supp. 788 (E.D.Pa.), *aff'd*, 835 F.2d 285 (3d Cir.1987), the United States District Court for the Eastern District of Pennsylvania considered a contract provision similar to the one here. In that case, there was a contract between the plaintiffs, employees of a psychiatric hospital, and the defendants, the owners of the hospital. *Id.* at 789. The contract provided that, if the net earnings of the hospital exceeded $1,500,000, the plaintiffs would be paid a sum of money. *Id.* Pursuant to the contract, the company's earnings "shall be the audited earnings of [the hospital] as determined by [the hospital's] outside auditors (**whose determination shall be final**), calculated in accordance with generally accepted accounting principles...." *Id.* at 789. The outside auditors determined that the net earnings exceeded $1,500,000, but the defendants were not satisfied that the calculation of earnings was done properly. *Id.*

When the defendants refused to pay, the plaintiffs filed suit, contending that "the auditor's calculations [were] final and binding." They claimed that "the finality language was deliberately included to avoid a future dispute as to whether the earnings target was met." *Id.* at 790. The defense argued, similar to Gebhardt & Smith's argument here, that the plaintiffs were not entitled to payment because the auditor's calculation was not in accordance with the agreement. *Id.*

The United States District Court found that the agreement was "clear and unambiguous," and that the "plain meaning" of the contract was that the auditor's determination was a binding determination. *Id.* at 793. The court stated:

> The purpose of a provision requiring a third party's opinion to be final and binding, as in this case, is to avoid the work required by litigation. The parties choose to forego the benefits and costs of presenting arguments and evidence from their own perspective and instead rely on an impartial third party to independently evaluate the evidence and make his own determination. Once the parties have done this, as long as the third party's opinion is an objective one,

made in good faith, it is deemed to be what the parties bargained for and is binding.

*Id.* at 792–93. Because the defendants had not alleged bad faith, the court granted summary judgment in favor of the plaintiffs. *Id.*

In *United States v. United Enters.*, 226 F.2d 359 (5th Cir.1995), the Fifth Circuit similarly construed a contract providing that the decision of an engineer regarding specifications "shall be final." The Court held that the engineer's decision was binding and conclusive on the parties to the contract. *Id.* at 362.

 We find the reasoning of these cases to be persuasive. When a contract provides that a determination rendered by a designated person is "final," that determination is binding on the parties and cannot be contested in court in the absence of fraud or bad faith.

 Gebhardt & Smith understandably is frustrated with its inability to challenge the sharp increase in the operating expenses. Gebhardt & Smith was a sophisticated tenant, however, and it could have protected itself from such a situation in several ways. Initially, it could have negotiated, as their expert Paul White testified tenants sometimes do, a limitation "in terms of dollar amount or percentage increase" in operating expenses. Moreover, it could have requested a provision in the Lease that allowed the tenant to contest questionable expenses. For example, in *Silverstein Props., Inc. v. Paine, Webber, Jackson & Curtis, Inc.*, 65 N.Y.2d 785, 493 N.Y.S.2d 110, 482 N.E.2d 906, 906 (1985), the lease provided that the statement of additional rent, provided by landlord to tenant "shall constitute a final determination" of additional rent, "unless Tenant within thirty (30) days after they are furnished shall give a written notice to Landlord that it disputes their accuracy or their appropriateness." No such provisions were included here. We have previously stated that "it is not the province of the court to rewrite the terms of a contract so as to avoid hardship to a party, or because one

party has become dissatisfied with its terms." *Phoenix,* 167 Md.App. at 393, 892 A.2d 1185.

A case that is instructive is *Newmark and Co. Real Estate, Inc. v. C & A Trimming Corp.,* 134 Misc.2d 371, 511 N.Y.S.2d 205 (N.Y.Civ.Ct.1987). That case involved a contract provision very similar to that involved here. The owner of commercial real estate sought to recover additional rent alleged to be due as rent escalation from its tenant. *Id.* at 206. As in this case, the lease provided for payment of fixed rent, subject to various adjustments for real estate taxes and operating expenses. *Id.* The contract provided "that a statement consisting of 'data prepared for the Lessor by firm of Certified Public Accountants' will be furnished to the tenant, which statement shall compute the additional rent and which 'shall constitute **a final** determination of the real estate taxes and operating expenses....'" *Id.* (emphasis added). After the landlord furnished a statement of the expenses, the tenant questioned the accuracy of the statement. *Id.* The Court stated: "In the plainest language, the lease stipulated that the statement submitted by the plaintiff's CPA would be **conclusive....**" *Id.* (Emphasis added).

Despite this finding, however, the court held that "fraud vitiates every agreement which it touches," and therefore, the conclusive language in the contract did not waive the defendant's right to prove fraud. *Id.* at 206–207. Thus, the court denied the landlord's motion for summary judgment, stating that the defendant was "entitled to its day in court." *Id.* at 207.

Here, Gebhardt & Smith had its day (or days) in court. There was a two week bench trial, during which Gebhardt & Smith presented evidence regarding the propriety of the operating expenses. In closing argument, Gebhardt & Smith argued: (1) that the Lease did not provide that the MPA's statement of expenses was incontestible; and (2) even if the Lease was so construed, it was entitled to judicial review of the certified public accountant's determination based on "fraud or bad faith."

With respect to a claim of fraud or bad faith, the only evidence relied upon by Gebhardt & Smith was the letter sent by Ms. Carmon advising that the statement of expenses had been "audited and certified by an independent public accountant." Gebhardt & Smith argues that, in sending this letter, MPA "bald out, shamelessly lied."

The trial court did not explicitly address Gebhardt and Smith's claim of fraud. Given the arguments of Gebhardt & Smith, however, and the undisputed caselaw providing that a contract provision providing for a binding determination can be contested based upon fraud, the circuit court's conclusion that "[t]he calculations of the CPA are presumed to be correct" constituted an implicit finding that the MPA did not commit fraud. *See Ball v. State*, 347 Md. 156, 206, 699 A.2d 1170 (1997) ("[t]rial judges are presumed to know the law and to apply it properly"), *cert. denied*, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998).

The circuit court's finding that there was no fraud is supported by the record. Initially, there was no claim that there was any fraud involved in the determination of the operating expenses. It is not clear that the letter sent to Gebhardt & Smith, which merely set forth the amount of the expenses, would constitute the type of fraud allowing for judicial review.

In any event, there was no evidence that the letter sent to Gebhardt & Smith was sent for the purpose of defrauding them. Ms. Carmon testified that she did not personally write the letter. Rather, it was a form letter that her predecessor gave to her. It was Ms. Carmon's understanding that the operating expenses had been audited and certified by an independent, certified public accountant, which she believed to be Ernst & Young and, subsequently, Abrams, Foster, Nole & Williams, based on the report that the accounting firms created and provided to the MPA.

In the absence of evidence showing that this letter was sent for the purpose of defrauding Gebhardt & Smith, the trial court properly ruled that Gebhardt & Smith was bound by the contract providing that the statement of operating expenses

"as determined by Lessor's certified public accountant" was a "final determination" between the parties. We find no error in the trial court's order declining to review the propriety of the operating expenses.[21]

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

21. Gebhardt & Smith's reliance on *P.V. Props., Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 77 Md.App. 77, 549 A.2d 403 (1988) is misplaced. *P.V. Props.* involved a lease agreement for the tenant of a shopping center to pay its proportionate share of the cost of maintaining the common areas of the shopping center. *Id.* at 80, 549 A.2d 403. This Court held that there was an implied requirement for the landlord to provide an itemization regarding the expenses incurred. *Id.* at 86, 549 A.2d 403. There was no issue in *P.V. Props., Inc.*, however, regarding whether the landlord's statement of expenses constituted a "final determination" between the parties.